UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>WASHINGTON STATE DEPARTMENT OF TRANSPORTATION,<br><br>Defendants. | CASE NO. C05-5447RJB<br><br>ORDER DENYING THE WSDOT'S MOTIONS FOR PARTIAL SUMMARY JUDGMENT ON RESPONSE COSTS AND REMOVAL ACTION COSTS AND GRANTING UNITED STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE ISSUE OF DEFENDANT'S LIABILITY |

This matter comes before the Court on United States' Motion for Partial Summary Judgment on the Issue of Defendant's Liability (Dkt. 83-1) and WSDOT's Motions for Partial Summary Judgment on Response Costs (Dkt. 101) and Removal Action Costs (Dkt. 97). The Court has considered the pleadings filed in support of and in opposition to the motions, the oral argument of counsel, and the file herein.

**I. FACTUAL BACKGROUND**

**A. DISCOVERY OF DRINKING WATER CONTAMINATION**

In August of 1993, the City of Tumwater conducted routine drinking water quality testing and discovered trichloroethylene ("TCE") in water from the Palermo Well Field ("Palermo" or

ORDER
Page 1

"PWF") in the Palermo Valley. *See* Dkt. 104-1, Exh. 10.[1] Palermo provides drinking water for 5,600 residents of the City of Tumwater. Dkt. 96, Exh. 7 at 5. In one of the wells tested, the TCE level was over the drinking water standard maximum contaminant level ("MCL") of 5 parts per billion ("ppb"). Dkt. 96, Exh. 7 at 7. The test of Well Number 2 revealed a TCW level of 12.6 ppb. Dkt. 104-1, Exh. 10. The tests of other wells revealed TCE levels of 0 ppb (Well Number 3), 1 ppb (Well Number 4), and 1.1 ppb (Well Number 5). *Id.* The water was retested over the next several days, and the results were confirmed. Six tests over the course of twenty days revealed the following range of TCE levels: 7-15 ppb in Well Number 2, 0.9-2.5 in Well Number 4, and 1.0-2.0 in Well Number 5. Dkt. 104-1, Exh. 10. The parties apparently do not dispute that this contamination was attributable, at least in part, to a Washington State Department of Transportation ("WSDOT") testing laboratory operated during the late 1960s and early 1970s and to a WSDOT materials testing lab. *See, e.g.,* Dkt. 101 at 11.

The City, coordinating with the State of Washington, continued to test the water at the Palermo Well Field. These tests revealed TCE, tetrachloroethylene ("PCE") in the groundwater of several residential blocks in the vicinity of the well field. The City removed the three contaminated wells from service. Dkt. 96, Exh. 7 at 9. Tests for Well Number 2 consistently showed TCE levels of greater than 5 ppb until August of 1996, when the levels ranged between 1.3 and 5.3. Dkt. 104-1, Exh. 10. The average TCE concentration for Well Number 2 from the initial test in August of 1993 until August of 1998 was 7.25 ppb. The average concentrations in the other wells were 2.5 ppb (Well Number 3), 1.47 ppb (Well Number 4), and 1.54 ppb (Well Number 5). *Id.*

To compensate for wells taken out of service due to contamination and address other water supply concerns, the City installed two new wells. Dkt. 104-17, Exh. 25. These wells provided water capacity greater than the capacity of the wells taken out of service. *See* Dkt. 106-6, Exh. 32 at 10.

**B. EPA INVOLVEMENT**

---

[1] The parties' cross motions for partial summary judgment were filed with the Court on September 8, 2006. The administrative record was not filed with the Court in paper form until November 2006. As a result, this Order cites to the administrative record by citing to exhibits to the motions containing portions of the administrative record.

ORDER
Page 2

To address its water quality concerns, the City sought the Environmental Protection Agency's ("EPA") assistance in September of 1993. In response, the EPA began investigating the site. In June of 1995, the EPA conducted a removal assessment, the purposes of which were to evaluate subsurface soils for PCE and/or TCE and to determine the need for emergency removal action. Dkt. 94-2, Exh. 4 at 54. The results of this testing indicated PCE and TCE near the Southgate Dry Cleaners. Dkt. Id. at 54, 64.

On December 31, 1996, the Washington State Department of Health, under cooperative agreement with the Agency for Toxic Substances and Disease Registry, evaluated the public health implications of TCE and PCE concentrations detected in standing water near the Palermo Well Field and evaluated levels detected in Palermo public drinking water supply wells at the request of the EPA. Dkt. 95-2, Exh. 6. This Health Consultation concluded that the level of contamination was not expected to impact public health. *See id.* at 5.

**C. SURFACE WATER CONTAMINATION**

The EPA was concerned that contaminated surface water could emit vapors, leading to inhalation of these chemicals by City residents. *See* Dkt. 104-2, Exh. 11 at 1. Of particular concern was the possibility that air contaminants might diffuse through the foundations of residences and into living spaces. *Id.* at 2. In March of 1997, the EPA tested for volatile organic chemicals in the standing water of residential crawlspaces. Dkt. 96, Exh. 7 at 17. A photo ionization detector found no detectable levels of TCE and PCE contamination. *Id.* The EPA did not view this reading as conclusive. This is because the photo ionization detector's detection limit was 1 part per million ("ppm"), well above the Acceptable Source Impact Levels for PCE and TCE. Dkt. 104-2, Exh. 11 at 1. Using maximum crawlspace concentration levels, the EPA predicted indoor air concentration levels above acceptable levels. *See* Dkt. 104-4, Exh. 13 at 10; 104-3, Exh. 12.

**D. REMOVAL**

On December 23, 1996, the EPA proposed the Palermo Well Field for addition to the National Priority List. The Site was added to the National Priority List on April 7, 1997. Dkt. 96, Exh. 7 at 19. The EPA issued an action memorandum ("First Action Memorandum") seeking

approval for a proposed "removal action" at the Palermo Well Field in June of 1997. Dkt. 96, Exh. 7. The First Action Memorandum identified several threats to public health or welfare: (1) Actual or potential exposure to nearby human population, animals, or the food chain; (2) actual or potential contamination of drinking water supplies or sensitive ecosystems; (3) high levels of hazardous substances in the soil that may migrate; and (4) weather conditions that may cause hazardous substances or pollutants or contaminants to migrate or be released. Dkt. 96, Exh. 7 at 24-28. The memorandum recommended two removal actions: (1) on-site soil vapor extraction treatment of wastes at the former Southgate Dry Cleaners location; and (2) installation of two air strippers to treat well water. *Id.* at 28.

**E. REMEDY**

The EPA also began a Remedial Investigation/Feasibility Study of the Palermo site and issued a formal Record of Decision on November 16, 1999. It selected several "remedial actions," which may be summarized as follows: (1) continued operation and maintenance of the air stripping system by the City to treat contaminated drinking water; (2) installation of a french drain to lower the water levels in crawlspaces under residences to reduce indoor air concentrations of TCE and PCE; (3) continued soil vapor extraction; and (4) ongoing monitoring. Dkt. 104-4, Exh. 13 at 9. The purpose of the french drain was to lower water to a depth below crawlspaces under residences in order to reduce indoor air concentration levels of TCE and PCE. Dkt. 104-4, Exh. 13 at 10.

## II. PROCEDURAL BACKGROUND

The United States brought suit against the WSDOT and Southgate Development Co., Inc. ("Southgate") in federal court, asserting that the defendants are liable under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERCLA"), 42 U.S.C. §§ 9607(a), 9613(g)(2), for "response costs" incurred and to be incurred by the EPA and the U.S. Department of Justice as a result of releases of hazardous substances at the Palermo Wellfield Superfund Site in Tumwater, Washington. The plaintiff's claims against Southgate have been resolved, and the WSDOT is the only remaining active defendant. The plaintiff seeks roughly eleven million dollars from the WSDOT for costs incurred through December 2005, exclusive of

1  interest.

2      Pending before the Court are the parties' cross motions for partial summary judgment on
3  the issue of whether the WSDOT is liable (Dkt. 83), whether the United States' costs constitute
4  "response costs" (Dkt. 101), and whether the United States is entitled to recover costs associated
5  with its removal action (Dkt. 97). On November 13, 2006, the Court heard oral argument on
6  these motions.

### III. DISCUSSION

**A. SUMMARY JUDGMENT STANDARD**

    Summary judgment is proper only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the non moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt."). *See also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

    The determination of the existence of a material fact is often a close question. The court must consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630. The court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will

1 discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial
2 to support the claim. *T.W. Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson, supra*).
3 Conclusory, non specific statements in affidavits are not sufficient, and missing facts will not be
4 presumed. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990).

## B. THE LEAD AND COPPER RULE

In 1993, the City was working to address copper levels in excess of the action level of 1.3 mg/L as proscribed by the EPA's Lead and Copper Rule. Dkt. 106-6, Exh. 32 at 7. The City was required to conduct a corrosion control study and recommend a treatment strategy to the Washington State Department of Health. Dkt. 106-6, Exh. 32 at 7. The City commissioned a report to recommend solutions to address the high copper levels. *See id.* The report recommends adding caustic soda to certain wells. *Id.* at 8. The EPA's Record of Decision acknowledges that as an "additional benefit," the air-stripping system had a favorable impact on corrosiveness due to high copper levels. Dkt. 104-4, Exh. 13 at 8. The WSDOT contends that the City's concerns with regard to compliance with the Lead and Copper Rule underlie the EPA's actions. *See, e.g.,* Dkt. 101 at 20. The WSDOT contends that the EPA's actions at the well field were geared towards appeasing the City and not based upon imminent threats to health or the environment.

The EPA's subjective motivations are irrelevant to determining whether it is entitled to recover response costs.

> We have previously rejected an 'ulterior motive' analysis in a challenge to whether CERCLA response costs incurred by a private landowner were necessary . . . . This logic applies with equal force when the EPA is a party. We therefore do not inquire into the EPA's subjective motives behind the cleanup, but rather ask if the objective evidence supports the response.

*U.S. v. W.R. Grace & Co.*, 429 F.3d 1224, 1233 n.14 (9th Cir. 2005). The ultimate inquiry is whether the EPA's actions were objectively arbitrary and capricious. That the EPA was motivated by the City's copper concerns may factor into this analysis but is not dispositive. The Court therefore declines to grant the WSDOT's motions on this basis.

## C. LIABILITY UNDER CERCLA

CERCLA imposes liability for the cleanup of sites where there is a release or threatened

release of hazardous substances into the environment. *Pakootas v. Teck Cominco Metals, Ltd.*, 452 F.3d 1066, 1073 (9th Cir. 2006). There are three elements of liability under CERCLA: (1) the site at which the actual or threatened release of hazardous substances occurred constitutes a "facility" under 42 U.S.C. §9601(9); (2) there was a "release" or "threatened release" of a hazardous substance from the facility, 42 U.S.C. §9607(a)(4); and (3) the party is within one of the four classes of persons subject to liability under 42 U.S.C. §9607(a). To recover response costs, the government must also prove that it incurred "response costs" in responding to the actual or threatened release. *U.S. v. Chapman*, 146 F.3d 1166, 1169 (9th Cir. 1998); 42 U.S.C. §9607(a)(4)(A) (defendants may be held liable for "all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan"). The burden then shifts to the defendant to prove that the government's action in responding was inconsistent with the National Contingency Plan ("NCP"). *Id.* Here, the only issues contested by the parties are whether the costs incurred by the United States constitute "response costs" and whether the EPA's actions are consistent with the NCP. *See* Dkt. 116 at 5.

**1. Response Costs**

The United States moves for partial summary judgment on the issue of the WSDOT's liability, contending that all four elements of its prima facie case are satisfied. Specifically, the United States characterizes the WSDOT's arguments as pertaining only to damages and cannot preclude summary judgment on the issue of liability. Dkt. 83-1 at 19, 23; *see Washington State Dept. of Transp. v. Washington Natural Gas Co., Pacificorp*, 59 F.3d 793, 798 (9th Cir. 1995 ("[F]ailure to comply with the NCP is not a defense to liability, but rather a factual issue affecting damages."). The WSDOT contends that the plaintiff fails to present a prima facie case because its costs do not constitute "response costs." Specifically, the WSDOT contends that the statutory definitions of "removal" and "remedial" actions require a threat to human health and that the EPA's actions do not comport with these definitions because there was no such threat.

CERCLA does not define "response costs." Whether the EPA's costs are associated with a property removal or remedial action is part of the inquiry required to determine whether the

ORDER
Page 7

EPA acted consistently with the NCP, which is addressed below. Having determined that the WSDOT's arguments regarding response costs do not apply to the plaintiff's prima facie case, the Court should grant the plaintiff's motion and hold that the United States is entitled to partial summary judgment on the issue of the WSDOT's liability. Whether the United States is entitled to recover some, all, or none of its response costs depends upon the WSDOT's ability to demonstrate inconsistency with the NCP.

### 2. Consistency with the NCP - Removal

To determine whether the EPA is entitled to recover response costs for a removal action, courts engage in a two-step inquiry. First, the decision to conduct a removal action must be upheld unless the WSDOT demonstrates on the administrative record that the decision was arbitrary and capricious or otherwise not in accordance with law. *See U.S. v. W.R. Grace & Co.*, 429 F.3d 1224, 1233 (9th Cir. 2005). This burden recognizes that selecting a particular response requires specialized knowledge and expertise and is within the discretion of the government. *Washington State Dept. of Transp.*, 59 F.3d at 802. Second, the action taken by the EPA must be properly characterized as a removal action. *See W.R. Grace & Co.*, 429 F.3d at 1233.

#### a. Arbitrary and Capricious or Otherwise not in Accordance with Law

The scope of review under the "arbitrary and capricious" standard is narrow and limited to determining whether the decision is based upon a consideration of the relevant factors and not a clear error of judgment. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto.*, 463 U.S. 29, 43 (1983). The agency must articulate a satisfactory explanation for its action based upon an examination of the relevant data, and the reviewing court will not substitute its judgment for that of the agency. *Id.* An agency's decision is arbitrary and capricious if the agency relied on factors that Congress did not intend it to consider, the agency failed to consider important aspects of the problem, the agency's proffered explanation contradicts the evidence before the agency, or the decision is implausible and not a product of agency expertise. *Inland Empire Pub. Lands Council v. Glickman*, 88 F.3d 697, 701 (9th Cir. 1996).

The NCP provides that the EPA may initiate appropriate removal action if it determines that there is "a threat to public health or welfare of the United States or the environment," based

upon the following factors:

> (i) Actual or potential exposure to nearby human populations, animals, or the food chain from hazardous substances or pollutants or contaminants;
>
> (ii) Actual or potential contamination of drinking water supplies or sensitive ecosystems;
>
> (iii) Hazardous substances or pollutants or contaminants in drums, barrels, tanks, or other bulk storage containers, that may pose a threat of release;
>
> (iv) High levels of hazardous substances or pollutants or contaminants in soils largely at or near the surface, that may migrate;
>
> (v) Weather conditions that may cause hazardous substances or pollutants or contaminants to migrate or be released;
>
> (vi) Threat of fire or explosion;
>
> (vii) The availability of other appropriate federal or state response mechanisms to respond to the release; and
>
> (viii) Other situations or factors that may pose threats to public health or welfare of the United States or the environment.

40 C.F.R. § 300.415(b). Here, the EPA considered and made findings regarding the first, second, fourth, and fifth factors in determining that there were threats to public health or welfare and the second and fourth factors in determining that there were threats to the environment. The WSDOT contends that the EPA's determination that there was an imminent and substantial endangerment to the public health or welfare or the environment was arbitrary and capricious on several grounds.

First, the WSDOT contends that soil and water contamination was discovered in 1993, and the EPA's First Action Memorandum cannot fairly characterize such contamination as an imminent threat years later. Dkt. 97 at 14, 17. As the WSDOT acknowledges, however, the First Memorandum relied, in part, on a 1997 sample showing TCE contamination levels in an area that had shown "non-detect" levels in 1995. *See, e.g.,* Dkt. 96, Exh. 7 at 27. The First Action Memorandum also references data from an April 1996 report. *Id.* at 23.

Second, the WSDOT contends that the mere detection of chemicals does not evidence a threat to nearby populations or the food chain without evidence of exposure pathways or the likelihood of exposure. Dkt. 97 at 14-15. The First Action Memorandum notes a general trend of

ORDER
Page 9

1  contamination migration from the Southgate Mall to the well field in the east, providing some
2  evidence of exposure pathways. Dkt. 96, Exh. 7 at 9.
3       Third, the WSDOT contends that the First Action Memorandum fails to consider whether
4  the City was capable of providing drinking water with contamination levels below the maximum
5  contaminant level in light of the City's blending of its well water and construction of new wells.
6  Dkt. 97 at 15. In light of the risk of contamination to the City's remaining wells due to migration
7  of contaminants, the Court cannot yet conclude that the First action memorandum's failure to
8  explicitly account for the City's water use practices was arbitrary and capricious.
9       Fourth, the WSDOT contends that the First Action Memorandum's reliance on data of
10 contaminant levels in TW-2 in 1996 is arbitrary and capricious because it does not address the fact
11 that this well had not been in use since 1993 or the Health Consultation's conclusion that there the
12 contamination posed no apparent public health hazard. Dkt. 97 at 16; *see* Dkt. 95-2, Exh. 6 at 6
13 ("[E]xposure ot the maximum concentration of TCE detected in PWF drinking water by children
14 or adults is unlikely to result in adverse non-carcinogenic health effects."). The plaintiff contends
15 that the Health Consultation's conclusion that the contamination did not pose a risk to public
16 health is retrospective and based upon the fact that contaminated wells were taken offline. Dkt.
17 127 at 14. That the EPA reached a conclusion different from the Health conclusion, particularly in
18 light of the threat that contaminants would migrate to pollute remaining operational wells, does
19 not necessarily render the EPA's decision arbitrary and capricious.
20      Fifth, the WSDOT contends that the First Action Memorandum made a decision before
21 the removal site evaluation was complete, in violation of the NCP. Dkt. 97 at 17. The plaintiff
22 contends that while the removal assessment was not published until two months after the First
23 Action Memorandum was issued, it was available to the EPA and clearly relied upon in the First
24 Action Memorandum. Dkt. 127 at 15. This contention does not demonstrate that the EPA's
25 decision was arbitrary and capricious or contrary to law.
26      Finally, the WSDOT contends that the EPA was arbitrary and capricious in its conclusion
27 that groundwater contaminated with TCE was a threat to marine species because the data was
28 from 1995 and reveals concentration levels less than half of the guidance level. Dkt. 97 at 18. The

First Action Memorandum concludes as follows:

> Elevated levels of TCE (to 824 ppb) measured at the site in the ground water are of primary concern, as TCE is toxic to marine species. Acute marine water quality guidance level of TCE is 2,000 ppb [citation omitted]. Direct contact and inhalation to fauna and flora are pathways to the food chain.

Dkt. 96, Exh. 7 at 27-28. The United States contends that there is no is no threshold or minimum release requirement under CERCLA, and that the EPA may respond to any release of a hazardous substance. Dkt. 127 at 23. This issue is of great importance in this case because the brunt of the WSDOT's argument is that the EPA should not have engaged in removal actions unless the soil guidance level and minimum contaminant level for drinking water were exceeded.

In support of its position, the United States cites *A & W Smelter and Refiners, Inc. v. Clinton*, 146 F.3d 1107, 1110 (9th Cir. 1998), in which the Ninth Circuit held that there is no minimum level requirement inherent in the definition of "hazardous" under CERCLA. The court acknowledged, though, that the level of contamination may be relevant to determining whether the EPA was arbitrary and capricious and noted that the issue had not been framed in such a way in that particular case. *Id.* at 1111 n.7, 1113. Whether contaminants are detected at the applicable maximum levels is relevant to determining whether there was a threat to public health or to the environment, which is a paramount preliminary finding before the EPA may instigate a removal action. *See* 40 C.F.R. § 300.415(b) ("where the lead agency makes the determination . . . that there is a threat to public health or welfare of the United States or the environment, the lead agency may take any appropriate removal action"). Because there was an apparent threat of contaminants migrating, the fact that contaminant levels were not yet in excess of relevant maximum levels does not establish that the EPA was arbitrary and capricious in beginning a removal action.

The administrative record in this case is lengthy and filled with scientific evidence. As presented to the Court at this stage of the proceedings, the administrative record evidences increased groundwater contamination over time and a threat of upgradient chemicals migrating to endanger uncontaminated wells sufficient to rebut the charge that the EPA was arbitrary and capricious.

### b. Proper Characterization of Removal Action

CERCLA and the National Contingency Plan divide response actions into two categories: removal actions and remedial actions. *W.R. Grace & Co.*, 429 F.3d at 1237. Removal actions are "time-sensitive responses to public health threats for which the EPA is granted considerable leeway in structuring the cleanup." *Id.* at 1228. Remedial actions, on the other hand, are "permanent remedies to threats for which an urgent response is not warranted." *Id.* Distinguishing between removal and remedial actions is critical under CERCLA because the requirements for remedial actions are more detailed and onerous. *Id.*

Whether the EPA's action falls within the statutory definition of removal action or remedial action is a question of statutory interpretation. *See id.* at 1233. In reviewing an agency's construction of the statutes it administers, the court engages in a two step inquiry. First, the court determines whether Congress has directly spoken to the issue. If so, the court gives effect to Congress' unambiguous expression of intent. *Id.* at 1236. If not, the court employs the EPA's construction of the statute. *Id.* at 1236-37. At a minimum, the EPA's classification is afforded "modified deference." *Id.* at 1237.

To determine whether the action was properly characterized as a removal action, courts may consider the time-sensitivity of the conditions at the site, the interplay between a removal and remedial action at a single site, and whether the action comports with the examples listed in 40 C.F.R. §415(e). *See id.* Courts may also consider the duration and permanence of the response, but these factors should be afforded less weight. *See id.* at 1244-45. This inquiry merits a "comprehensive view of the administrative record." *See id.* Here, the WSDOT contests whether the EPA's well water treatment system was properly characterized as a removal action. Dkt. 97 at 10. Because the Ninth Circuit recently determined that Congress has not clearly differentiated between removal and remedial action, the Court's analysis begins at the second step to determine whether the EPA's classification of the well field air strippers comports with the EPA's definition of removal actions.

### i. Time Sensitivity

As detailed above, the EPA relied upon data from 1996 at 1997 in deciding to recommend

ORDER
Page 12

1  a removal action in 1997 as opposed to earlier. Consideration of this factor suggests that the
2  action was properly characterized as a removal.

### ii. Interplay Between Removal and Remedial Actions

4  If the EPA's disputed course of action is followed by remedial measures, the initial action
5  may be characterized as a removal because the NCP contemplates progression from removal to a
6  comprehensive remedial plan. *See W.R. Grace & Co.*, 429 F.3d at 1242-43. Here, the First Action
7  Memorandum seems to contemplate progression to remedial action: "This emergency action
8  contributes toward the necessary steps to stabilize the site. The well head treatment and on-site
9  soil vapor extraction treatment system options require continued operation and maintenance to
10 stabilize contamination for an undetermined period of time." Dkt. 96, Exh. 7 at 29. With respect
11 to contaminated drinking water, the EPA's selected remedy was to continue operation of the air
12 stripping system and establish a long term groundwater monitoring system. Dkt. 104-4, Exh. 13 at
13 10-11. With the exception of the french drain system, the distinction between the EPA's removal
14 action and these remedies is arguably superficial. It does not appear that the removal actions
15 "paved the way" or were a "prelude" to the remedial actions. *See W.R. Grace & Co.*, 429 F.3d at
16 1243. Based upon the administrative record, as presented to the Court thus far, the Court cannot
17 determine whether this factor weighs in favor of characterizing the action as a removal.

### iii. Examples in 40 C.F.R. §415(e)

19 The NCP provides a non-exhaustive list of activities generally considered removal actions,
20 which may be summarized as follows: security or site control precautions (fences and warning
21 signs), drainage controls to prevent run-off, stabilization where needed to maintain the integrity of
22 structures, capping of contaminated soils or sludges, using chemicals to retard release, removal of
23 contaminated soils, removal of containers containing hazardous contaminants, containment or
24 treatment of hazardous materials, and providing an alternate water supply. 40 C.F.R. §415(e).
25 The air stripping system does not appear to fall within this list.
26 The WSDOT contends that the EPA typically classifies air stripping systems as remedies,
27 citing *U.S. v. Findett Corp.*, 220 F.3d 842, 848 (8th Cir. 2000), and *J. Kelley v. Thomas Solvent*
28 *Co.*, 727 F. Supp. 1532, 1538 (W.D. Mich. 1989). Consideration of this factor suggests that the

ORDER
Page 13

1 air stripping system was not properly classified as a removal.

### iv. Duration and Permanence

While removal actions ordinarily last for only a short duration, this is not always the case. *See W.R. Grace & Co.*, 429 F.3d at 1244. Similarly, removal actions are not necessarily short term responses and may involve permanent solutions. Rather than viewing a temporary solution of short duration as a typical removal action, courts should look for "interim or partial response actions that are focused on immediate risk reduction" to distinguish removal action from remedial action. *See id.* 1245. Here, the air stripping system appears aimed not at merely an interim or partial response but at putting in place a solution that would later form the bulk of the selected remedial action. This factor weighs against classifying the air stripping system as a removal action.

### v. Conclusion

Several factors must be considered in determining whether the EPA's actions were properly deemed a removal rather than a remedy. The majority of these factors suggest that the EPA's classification was improper: with respect to the well field, the removal and remedial actions are very similar, air stripping is not recognized as a removal action by the NCP and has been characterized as a remedy by the EPA, and the air stripping system arguably constituted more than a mere interim or partial response. At this stage, however, the Court cannot yet find that the EPA's characterization of its actions as a removal was improper as a matter of law.

### 3. Remedy

The primary basis for the WSDOT's contention that the EPA is not entitled to recover response costs for installation of the french drain system is that the evidentiary basis for the french drain was computer modeling. Dkt. 101 at 14. The WSDOT offers no authority for the notion that the EPA cannot rely on such data. *But see G.J. Leasing Co., Inc. v. Union Elec. Co.*, 854 F. Supp. 539, 562 (S.D.Ill. 1994) (in an action by a private party to recover response costs, the costs must be necessary and not in response to a merely theoretical threat). The WSDOT's motion should be denied in this respect.

### **IV. ORDER**

Therefore, it is hereby

1 **ORDERED** that WSDOT's Motions for Partial Summary Judgment on Response Costs
2 (Dkt. 101) and Removal Action Costs (Dkt. 97) are **DENIED**, and United States' Motion for
3 Partial Summary Judgment on the Issue of Defendant's Liability (Dkt. 83-1) is **GRANTED**.
4 What, if any, response costs defendant is liable for remains an issue for trial.

The Clerk of the Court is instructed to send uncertified copies of this Order to all counsel of record and to any party appearing *pro se* at said party's last known address.

DATED this 15th day of November, 2006.

／s／ Robert J. Bryan
Robert J. Bryan
United States District Judge