1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

UNITED STATES OF AMERICA,

Plaintiff,

v.

WASHINGTON STATE DEPARTMENT
OF TRANSPORTATION,

Defendants.

CASE NO. C05-5447RJB

OPINION INCLUDING
FEDERAL RULE 52(a)
FINDINGS OF FACT AND
CONCLUSIONS OF LAW

This matter comes before the Court on the bench trial conducted on January 10 and
January 12, 2007. Dkt. 176, 178. The Court has considered the testimony and arguments at trial,
the parties' briefing, documents filed by the parties prior to trial, previous orders of the Court, the
administrative record, and the remainder of the file herein.

## I. FACTUAL BACKGROUND

The Palermo Wellfield Superfund Site ("the Site") is defined by groundwater contaminant
plumes in Tumwater, Washington at, and in the vicinity of, the Palermo Wellfield ("PWF") and
Palermo neighborhood. The Palermo Wellfield provides drinking water for the City of Tumwater
("the City"), Washington. The Palermo Wellfield is adjacent to a residential neighborhood in the
Palermo Valley, a lowland located in the Deschutes River floodplain. The neighborhood consists
of detached, single-family homes bordered on the southeast by the well field, to the northeast by
the Tumwater Municipal Golf Course, and to the west by the Palermo Bluff. The Palermo Bluff, a
sixty foot rise in elevation from east to west, separates the Palermo Valley (approximately 100

1    feet above sea level) from the Palermo Uplands (approximately 160 feet above sea level). The

2    Palermo Bluff is approximately 800 feet west of the Palermo Wellfield. Continuing west from the

3    Palermo Bluff, the Palermo Uplands encompasses commercial and residential parts of Tumwater.

4    Interstate highway ("I-5") transects the Uplands portion of the Site from southwest to northeast.

5    Groundwater flows generally from the west to the east/northeast.

6         In August of 1993, the City of Tumwater conducted routine drinking water quality testing

7    and discovered trichloroethylene ("TCE") in water from three wells (Wells 2, 4, and 5) at the

8    Palermo Wellfield. The Palermo Wellfield provides drinking water for 5,600 residents of the City

9    of Tumwater. In one of the wells tested, the TCE level was over the drinking water standard

10   maximum contaminant level ("MCL") of 5 parts per billion ("ppb"). The water was retested over

11   the next several days, and the results were confirmed. The parties do not dispute that this

12   contamination was attributable, in part, to a Washington State Department of Transportation

13   ("WSDOT") testing laboratory operated during the late 1960s and early 1970s and, possibly, to a

14   currently operated WSDOT materials testing lab. Other possible sources for the contamination,

15   including the Southgate Dry Cleaners and the Brewery City Pizza location, have also been

16   identified. The parties agree that TCE at the Site is attributable, in part, to biodegradation of

17   perchloroethylene ("PCE") to TCE. There is no evidence in the record, and the parties did not

18   offer evidence or testimony at trial, demonstrating the rate or extent of such biodegradation.

19        The City removed the three contaminated wells from service. The City then installed two

20   new wells, which provided water capacity greater than the capacity of the wells taken out of

21   service. 1048074.[1]

22        To address its water quality concerns, the City sought the Environmental Protection

23   Agency's ("EPA") assistance in September of 1993. The EPA completed a Phase I CERCLA

24   Assessment in March of 1995, a removal assessment at Southgate Dry Cleaners in May of 1995,

25

26        [1] In references to the administrative record, the Court cites the seven-digit document identification
     numbers of documents in the Certified Remedial Administrative Record and Certified Removal Administrative
27   Record. Except as indicated, the Court has considered only documents in the Certified Removal Administrative
     Record when evaluating the removal action and only documents in the Certified Remedial Administrative record
28   when evaluating the remedial action.

1  an Expanded Site Investigation in 1996, and a second removal assessment in March of 1997. The

2  Site was added to the National Priority List on April 7, 1997.

3       On July 3, 1997,[2] the EPA issued an Action Memorandum, authored by the EPA On-

4  Scene Coordinator, selecting removal actions. 1048496. Later action memoranda approved a

5  ceiling increase and an exemption of the two million dollar limit for removal actions and an

6  exemption of the twelve month limit for removal actions. 1048789, 1105726. Removal actions

7  were initiated at the Site in March of 1998. One such action was installation of a soil vapor

8  extraction ("SVE") system at the former Southgate Dry Cleaners, the purpose of which was to

9  remove PCE from soil and halt its release to groundwater. The SVE system began operation in

10  1998 and was decommissioned in June of 2000. The second component of the removal was the

11  EPA's installation of two air strippers at the Palermo Wellfield. An air stripper transfers

12  contaminants from water to air by blowing air upward as water flows downward. 1224288-0021.

13  The air is then treated before being discharged. *Id.* Construction of the air stripping system was

14  completed in February of 1999.

15       On November 16, 1998, the Regional Administrator for EPA Region 10 signed a Record

16  of Decision ("ROD") documenting the long-term remedial action that the EPA selected for the

17  Site. The selected remedy incorporated the continued operation of the wellhead treatment and

18  SVE systems. It also selected construction of a subdrain ("french drain") system to collect

19  groundwater containing TCE and PCE surfacing in the area of residences at the base of the

20  Palermo Bluff. On-site construction of the subdrain system began on August 8, 2000, and the

21  system continues to operate.

22                              **II. PROCEDURAL BACKGROUND**

23       The United States brought suit against the WSDOT and Southgate Development Co., Inc.

24  ("Southgate") in federal court, asserting that the defendants are liable under the Comprehensive

25  Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERCLA"), 42

26  U.S.C. §§ 9607(a), 9613(g)(2), for "response costs" incurred and to be incurred by the EPA and

27

28       [2] The Action Memorandum is dated June 27, 1997, but was signed with approval on July 3, 1997.

OPINION
Page 3

1  the U.S. Department of Justice as a result of releases of hazardous substances at the Palermo

2  Wellfield Superfund Site in Tumwater, Washington. The plaintiff's claims against Southgate are in

3  the process of being resolved by settlement. A consent decree has been filed but has not yet been

4  approved by the Court. No other potentially responsible parties have been identified, and the

5  WSDOT is the only remaining active defendant. The plaintiff seeks to impose joint and several

6  liability on the WSDOT for $11,420,040.26 for costs incurred through December 2005.

7       By agreement of the parties, the WSDOT presented testimony and argument at trial first,

8  and the United States responded. The administrative record in this case is lengthy and filled with

9  scientific data. The Court is not concerned with merely the quantity of data in the record,

10  however. The Court's inquiry is whether the record supports the EPA's actions, and this inquiry

11  requires that the EPA's conclusions be linked with specific pieces of evidence in the record. The

12  United States was therefore required to offer detailed and specific references to the administrative

13  record to refute the WSDOT's arguments. The Court was disappointed by the plaintiff's inability

14  or unwillingness to refer to specific portions of the administrative record in direct response to the

15  defendant's claims.

16  **A. THE ADMINISTRATIVE RECORD**

17       As the parties are surely aware, the treatment of the administrative record in this case has

18  been extremely problematic. *See* Dkt. 152 (Order Granting in Part and Denying in Part WSDOT's

19  Motion to Supplement the Administrative Record). On June 29, 2006, the United States moved

20  for a protective order and to limit discovery to the EPA's administrative record. Dkt. 57. On July

21  11, 2006, while the plaintiff's motion was pending, the EPA added documents to the

22  administrative record in response to the EPA's On-Scene Coordinator's determination that

23  documents considered or relied upon by the EPA had been omitted. Dkt. 128-1 at 3, 128-7, Exh.

24  6 at 2 (memorandum requesting addition of documents to Removal Administrative Record). All

25  but one of these documents were omitted from the administrative record but were included in the

26  Site File. Dkt. 128-7, Exh. 6 at 2. The plaintiff filed its reply on the same day that the documents

27  were added and did not inform the Court or opposing counsel that the administrative record had

28  changed. See Dkt. 69-1 (plaintiff's reply). On July 17, 2006, the Court granted the plaintiff's

1  motion. Dkt. 70.

2         The administrative record was not certified and filed with the Court until October 12,

3  2006. Dkt. 136 (compact discs containing Certified Remedial Administrative Record and Certified

4  Removal Administrative Record filed). Upon motion by the WSDOT, the Court held that certain

5  exhibits would be considered as supplemental materials to the record. Dkt. 152. Due primarily to

6  the fact that the an Action Memorandum and other materials that both parties agreed should be

7  included but would otherwise be excluded from the record, the Court reluctantly declined to

8  exclude the documents added by the On-Scene Coordinator. Dkt. 152. The Court's findings and

9  conclusions are therefore based upon the administrative record as filed with the Court in compact

10  disc format and in hard copy and the attached supplemental materials.

11         In response to a request by the Court and to comply with court rules, the plaintiff also

12  filed paper copies of the Removal Action Administrative Record and the Joint Condensed

13  Remedial Action Administrative Record with the Court on November 2, 2006. Dkt. 156.

14  Unfortunately, the copies of the Remedial Administrative Record were not in numerical order and

15  the organization of the binders provided to the Court were such that it was extremely difficult to

16  discern which binders housed which documents. Navigation of the record by the Court has been

17  extremely time consuming.

18         The compact disc version of the administrative record has also proven to be problematic.

19  As an example, a computer file named 1044966 and found on the compact disc containing the

20  Certified Removal Administrative Record actually contains the document 1044996. While

21  document 1044966 is included in the Court's paper copies, it appears to be either excluded from

22  or mislabeled in the compact disc version. The Court notes that document 1048502 is nearly

23  identical to document 1044966.

24         Also, the compact discs filed with the Court appear to be copies of the record and not the

25  record themselves; they bear the name of this case on the labels, and the indices and tables of

26  contents on the discs are actually copies of documents filed in this case, bearing the case and

27  docket numbers on the top of each page. These and other problems raise serious concerns about

28  the reliability, accuracy, and completeness of the administrative record and about the

OPINION
Page 5

1  government's actions at the Site.

2  **B. COSTS**

3      The United States seeks a total of $11,420,040.26 from the WSDOT and to impose joint

4  and several liability. Dkt. 154-1. By stipulation of the parties, this amount is not in dispute. Dkt.

5  165. The United States does not seek costs of the SVE from the WSDOT. *Id.*

6  **C. LIABILITY**

7      The Court previously held that the WSDOT is liable under CERCLA (Dkt. 160 at 8),

8  leaving the following issues for trial: (1) Whether the United States incurred "response" costs

9  within the meaning of CERCLA Section 101 (25), 42 U.S.C. §9601 (25), rendering defendant

10  WSDOT liable under Section 107(a)(2) of CERCLA, 42 U.S.C. §9607 (a)(2); (2) Whether the

11  removal actions taken by the United States were inconsistent with the National Contingency Plan;

12  and (3) Whether construction of the air strippers at the Palermo Wellfield falls within the statutory

13  definition of a removal action. Dkt. 154-1 at 9 (Pretrial Order).

14                          **III. STATUTORY SCHEME**

15      CERCLA was enacted to facilitate "expeditious and efficient cleanup of hazardous waste

16  sites." *Carson Harbor Village, Ltd. v. Unocal Corp.*, 270 F.3d 863, 880 (9th Cir. 2001). Its

17  secondary purpose is to hold responsible parties accountable for cleanup efforts. *Id.* CERCLA

18  accomplishes these goals by imposing strict liability on owners and operators of facilities where

19  releases of hazardous substances occur. *Id.* at 870. This liability is joint and several, subject to

20  statutory defenses set forth in 42 U.S.C. §9607(b). *See California v. Montrose Chemical Corp. of*

21  *California*, 104 F.3d 1507, 1518 n.9 (9th Cir. 1997).

22      Under CERCLA, the President's authority to initiate response actions is broad:

23      (a) Removal and other remedial action by President; applicability of national contingency
        plan; response by potentially responsible parties; public health threats; limitations on
24      response; exception

25          (1) Whenever (A) any hazardous substance is released or there is a substantial
            threat of such a release into the environment, or (B) there is a release or substantial
26          threat of release into the environment of any pollutant or contaminant which may
            present an imminent and substantial danger to the public health or welfare, the
27          President is authorized to act, consistent with the national contingency plan, to
            remove or arrange for the removal of, and provide for remedial action relating to
28          such hazardous substance, pollutant, or contaminant at any time (including its

OPINION
Page 6

1  removal from any contaminated natural resource), or take any other response
   measure consistent with the national contingency plan which the President deems
2  necessary to protect the public health or welfare or the environment.

3  42 U.S.C. §9604(a)(1).

4      CERCLA and the National Contingency Plan ("NCP") divide response actions into two

5  categories: removal actions and remedial actions. *U.S. v. W.R. Grace & Co.*, 429 F.3d 1224, 1237

6  (9th Cir. 2005). Removal actions are defined as follows:

7      The terms "remove" or "removal" means [sic] the cleanup or removal of released
       hazardous substances from the environment, such actions as may be necessary taken in the
8      event of the threat of release of hazardous substances into the environment, such actions
       as may be necessary to monitor, assess, and evaluate the release or threat of release of
9      hazardous substances, the disposal of removed material, or the taking of such other
       actions as may be necessary to prevent, minimize, or mitigate damage to the public health
10     or welfare or to the environment, which may otherwise result from a release or threat of
       release. The term includes, in addition, without being limited to, security fencing or other
11     measures to limit access, provision of alternative water supplies, temporary evacuation and
       housing of threatened individuals not otherwise provided for, action taken under section
12     9604(b) of this title, and any emergency assistance which may be provided under the
       Disaster Relief and Emergency Assistance Act [42 U.S.C.A. § 5121 et seq.].
13
   42 U.S.C. §9601(23). Remedial actions are defined as follows:
14
15     The terms "remedy" or "remedial action" means [sic] those actions consistent with
       permanent remedy taken instead of or in addition to removal actions in the event of a
16     release or threatened release of a hazardous substance into the environment, to prevent or
       minimize the release of hazardous substances so that they do not migrate to cause
17     substantial danger to present or future public health or welfare or the environment. The
       term includes, but is not limited to, such actions at the location of the release as storage,
18     confinement, perimeter protection using dikes, trenches, or ditches, clay cover,
       neutralization, cleanup of released hazardous substances and associated contaminated
19     materials, recycling or reuse, diversion, destruction, segregation of reactive wastes,
       dredging or excavations, repair or replacement of leaking containers, collection of leachate
20     and runoff, onsite treatment or incineration, provision of alternative water supplies, and
       any monitoring reasonably required to assure that such actions protect the public health
21     and welfare and the environment. The term includes the costs of permanent relocation of
       residents and businesses and community facilities where the President determines that,
22     alone or in combination with other measures, such relocation is more cost-effective than
       and environmentally preferable to the transportation, storage, treatment, destruction, or
23     secure disposition offsite of hazardous substances, or may otherwise be necessary to
       protect the public health or welfare; the term includes offsite transport and offsite storage,
24     treatment, destruction, or secure disposition of hazardous substances and associated
       contaminated materials.

25  42 U.S.C. §9601(24). Distinguishing between removal and remedial actions is critical under

26  CERCLA because the requirements for remedial actions are more detailed and onerous. *See, e.g.,*

27  *W.R. Grace & Co.*, 429 F.3d at 1226 ("For example, a remedial action requires certain analysis of

28  the costs and effectiveness of the remediation and also requires inclusion on the National Priority

OPINION
Page 7

1  List. See 40 C.F.R. §§300.425(b)(1), 300.430(e)(7).").

2      To recover its costs for engaging in response actions, the EPA must prove as follows: (1)

3  the site at which the actual or threatened release of hazardous substances occurred constitutes a

4  "facility" under 42 U.S.C. §9601(9); (2) there was a "release" or "threatened release" of a

5  hazardous substance; (3) the party is within one of the four classes of persons subject to liability

6  under 42 U.S.C. §9607(a); and (4) the EPA incurred response costs in responding to the actual or

7  threatened release. *See U.S. v. Chapman*, 146 F.3d 1166, 1169 (9th Cir. 1998); 42 U.S.C.

8  §9607(a)(4)(A) (defendants may be held liable for "all costs of removal or remedial action

9  incurred by the United States Government or a State or an Indian tribe not inconsistent with the

10  national contingency plan").

11      The burden then shifts to the defendant to prove that the government's action in

12  responding was inconsistent with the NCP. *Chapman*, 146 F.3d at 1169. To prove inconsistency

13  with the NCP, the defendant must demonstrate that the response actions were arbitrary and

14  capricious or otherwise not in accordance with law. *See Washington State Dept. of Transp. v.*

15  *Washington Natural Gas Co.*, 59 F.3d 793, 802 (9th Cir. 1995). An agency's decision is arbitrary

16  and capricious if the agency "relied on factors which Congress has not intended it to consider,

17  entirely failed to consider an important aspect of the problem, offered an explanation for its

18  decision that runs counter to the evidence before the agency, or is so implausible that it could not

19  be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n*

20  *of U.S., Inc. v. State Farm Mut. Auto.*, 463 U.S. 29, 43 (1983).

21      Judicial review of the EPA's response is governed by statute:

22      (j) Judicial review

23          (1) Limitation
            In any judicial action under this chapter, judicial review of any issues concerning
24          the adequacy of any response action taken or ordered by the President shall be
            limited to the administrative record. Otherwise applicable principles of
25          administrative law shall govern whether any supplemental materials may be
            considered by the court.

26
            (2) Standard
27          In considering objections raised in any judicial action under this chapter, the court
            shall uphold the President's decision in selecting the response action unless the
28          objecting party can demonstrate, on the administrative record, that the decision

1   was arbitrary and capricious or otherwise not in accordance with law.

2   (3) Remedy
    If the court finds that the selection of the response action was arbitrary and
3   capricious or otherwise not in accordance with law, the court shall award (A) only
    the response costs or damages that are not inconsistent with the national
4   contingency plan, and (B) such other relief as is consistent with the National
    Contingency Plan.
5
    (4) Procedural errors
6   In reviewing alleged procedural errors, the court may disallow costs or damages
    only if the errors were so serious and related to matters of such central relevance
7   to the action that the action would have been significantly changed had such errors
    not been made.
8
9   42 U.S.C. §9613(j).

10   ## IV. DISCUSSION

11   The EPA seeks to recover response costs from the WSDOT, and the WSDOT seeks to

12   avoid payment of those costs. The WSDOT alleges that certain aspects of both the removal and

13   remedy selected and implemented by the EPA were arbitrary and capricious or otherwise not in

14   accordance with law and therefore inconsistent with the NCP.

15   **A. REMOVAL ACTION**

16   To determine whether the EPA is entitled to recover response costs for a removal action,

17   courts engage in a two-step inquiry. First, the decision to conduct a removal action must be

18   upheld unless the defendant demonstrates on the administrative record that the decision was

19   arbitrary and capricious or otherwise not in accordance with law. *See W.R. Grace & Co.*, 429

20   F.3d at 1233. Second, the action taken by the EPA must be properly characterized as a removal

21   action. *Id.* Here, the WSDOT contends that the decision to install the air strippers as a removal

22   action was arbitrary and capricious and that the air strippers were improperly characterized as a

23   removal action rather than as a remedial action. As detailed below, the Court concludes that the

24   WSDOT is successful in arguing both points but that the WSDOT may nevertheless be

25   responsible for some, or all, of the response costs.

26

27

28

### 1. Arbitrary and Capricious or Otherwise not in Accordance with Law

In the first step of the analysis, the EPA's decision to conduct a removal action must be upheld unless the defendant demonstrates on the administrative record that the decision was arbitrary and capricious or otherwise not in accordance with law. *See id*. This burden recognizes that selecting a particular response requires specialized knowledge and expertise and is within the discretion of the government. *Washington State Dept. of Transp.*, 59 F.3d at 802.

The scope of review under the "arbitrary and capricious" standard is narrow and limited to determining whether the decision is based upon a consideration of the relevant factors and is not a clear error of judgment. *Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43. The agency must articulate a satisfactory explanation for its action based upon an examination of the relevant data, and the reviewing court will not substitute its judgment for that of the agency. *Id.* An agency's decision is arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id*. The reviewing court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned" but should not "supply a reasoned basis for the agency's action that the agency itself has not given." *Id*.

The NCP provides that the EPA may initiate appropriate removal action if it determines that there is "a threat to public health or welfare of the United States or the environment," based upon the following factors:

(i) Actual or potential exposure to nearby human populations, animals, or the food chain from hazardous substances or pollutants or contaminants;

(ii) Actual or potential contamination of drinking water supplies or sensitive ecosystems;

(iii) Hazardous substances or pollutants or contaminants in drums, barrels, tanks, or other bulk storage containers, that may pose a threat of release;

(iv) High levels of hazardous substances or pollutants or contaminants in soils largely at or near the surface, that may migrate;

(v) Weather conditions that may cause hazardous substances or pollutants or contaminants to migrate or be released;

(vi) Threat of fire or explosion;

(vii) The availability of other appropriate federal or state response mechanisms to respond to the release; and

(viii) Other situations or factors that may pose threats to public health or welfare of the United States or the environment.

40 C.F.R. §300.415(b). There is no precise formula for determining whether the EPA's consideration of these factors is sufficient, and the *W.R. Grace* case offers only limited guidance. In that case, the EPA's decision to conduct a removal was upheld where the EPA's "findings [we]re extensively documented" and the memorandum "detail[ed] specific threats" with "carefully documented reasoning." *See W.R. Grace & Co.*, 429 F.3d at 1233.

Here, the EPA considered and made findings regarding the first, second, fourth, and fifth factors in determining that there were threats to public health or welfare and regarding the second and fourth factors in determining that there were threats to the environment. Based upon these findings, the EPA concluded, "Actual and threatened release of hazardous substances from this site, if not addressed by implementing the response action selected in this action memorandum, may present an imminent and substantial endangerment to public health, or welfare, or the environment." 1048496-0028.

### a. Actual or potential exposure to nearby human populations, animals, or the food chain

At trial, the WSDOT contended that the EPA's consideration of the first factor was arbitrary and capricious because the mere presence of hazardous substances is insufficient to justify a removal and that to hold otherwise would allow the EPA to routinely circumvent the more arduous requirements for remedial action. The 1997 Action Memorandum's consideration of the first factor in determining that there was a threat to public health or welfare is as follows:

TCE, PCE and other VOC contamination exist in ground water, surface water, and soils on site. The maximum contaminant level (MCL) for TCE is 0.005 mg/l.[3] ATSDR has derived an intermediate-duration inhalation minimum risk level (MRL) of 2 ppm and an

---

[3] To make excerpts of the Action Memorandum more readable, the Court has excluded some parenthetical citations contained in the Action Memorandum and instead presented the citations verbatim by footnote. The citation omitted from this portion of the Action Memorandum is as follows: "(EPA 1989c (40 CFR 141, 142, 143) ATSDR TP-92/18)."

oral MRL dose of 0.7 mg/kg/day, based on rat studies.[4] A PCE acute inhalation minimum risk level is 0.6 ppm. The total VOC's in soil to 1,967 ppb PCE (97020752, VM-3 at 5 BGS) are detected at Southgate Mall (See Appendix III).

1048496-0024.

This relatively short explanation fails to articulate how the concentration levels listed result, or potentially result, in exposure to humans, animals, or the food chain and does not reference data in the record that may support this conclusion. In addition, the connection between inhalation minimum risk levels and the proposed removal action is unclear. At trial, the United States referenced data supporting the EPA's concern that the contaminant plume would migrate and affect uncontaminated wells that were in operation, data that are addressed in more detail below, but failed to articulate the factual underpinnings for this particular factor. The EPA's conclusion that there was actual or potential exposure to nearby human populations, animals, or the food chain that may be imminent and substantial is not supported by the record.

### b. Actual or potential contamination of drinking water supplies or sensitive ecosystems

The 1997 Action Memorandum lists the second factor as a basis for concluding that there was a threat to public health or welfare or the environment such that a removal action was appropriate. This factor was considered at more length and appears to be one of the more significant considerations in determining that a removal action was proper. The 1997 Action Memorandum's consideration of the second factor with respect to a threat to public health or welfare is as follows:

The City can no longer meet sustained peak demand days. Due to contamination, the city has actively rationed water since 1993. There is no other available water supply in the area. The TCE concentrations in ground water have been observed to exceed the maximum contaminant level (MCL) for drinking water. The total TCE concentration levels in groundwater measured on site from the groundwater drinking water well is 13.3 ppb (PWFW-2) based on samples taken August 6, 1996.[5] This is over 2 times the

---

[4] "(ATSDR TP92/19, pg. 107)."

[5] "(Palermo Well Field TCE Test Results, (See Appendix I)[)]."

OPINION
Page 12

maximum contaminant level (MCL) for drinking water, which is five (5) ppb.[6] Groundwater samples to 824 ppb were detected at Rainier and "O" Street in the ground water (35 feet BGS Weston-GP-13) approximately 500 feet upgradient of the PWF municipal wells (Weston, 1996). This is 164 times the maximum contaminant level (MCL) for drinking water which is 5 ppb.[7] Historic (March, 1996) monitoring well analyses show TCE concentrations to 98.8 ppb and PCE concentrations to 0.74 ppb PCE from depths of 92 feet BGS, (MW-09) (WDOH, 1996)[.] At twenty-five (25) feet BGS near "N" street, TCE concentrations to 113.15j ppb (97020978, GP 12) were detected. At five (5) BGS near Rainier Avenue and "N" street, TCE concentrations to 41.33 ppb (97020965, GP-11) were detected from 700 feet west of PWF municipal wells (START, 1997) (See Appendix III).

1048496-0024-25. The 1997 Action Memorandum's conclusion with respect to a threat to the environment is nearly identical to this excerpt.

The EPA's conclusion that there was actual or potential contamination of drinking water supplies is essentially based upon the EPA's finding that the City could not meet demands for clean drinking water and that contamination levels exceeded the MCL. The WSDOT contends that both of these conclusions were arbitrary and capricious because they contradict evidence in the record and other evidence that should have been considered.

First, the evidence that the City could not meet customer demands for clean drinking water is virtually nonexistent. Earlier in the Action Memorandum, a personal communication with Jay Eaton is cited as a basis for the conclusion that the City "will not be able to meet sustained peak demand days for summer." 1048496-0007. The year in which the communication took place is 1997, but no other details are given. There is no record or transcript of this conversation in the administrative record. In light of the EPA's handling of the administrative record in this case, addressed above, the Court cannot rely on the On-Scene Coordinator's recollection as probative evidence of the City's alleged water shortages.

Second, the conclusion fails to take into account other evidence in the record. For example, the 1992 Final Report of the City of Tumwater Groundwater Supply Planning Project recommended replacement of Wells 1 and 2 and redevelopment or replacement of Wells 4 and 5

---

[6] "(40 CFR Section 261.52)."

[7] "(EPA 1989c (40 CFR Sections 141, 142, 143, and 261.52)[.]"

1  due to well inefficiencies that resulted in the wells not being able to fully utilize the Qva aquifer

2  potential or the City's anticipated water right of 3,050 gallons per minute. 1044991-0009. In

3  other words, the contaminated wells (Wells 2, 4, and 5) were likely already slated for replacement

4  or redevelopment before the contamination was discovered. Also, the lost pumping capacity from

5  Wells 2, 4, and 5 was compensated for by the construction of two new wells in 1994. Lead and

6  Copper Rule Corrosion Control Study at 10 ("The combined capacity of Wells 12, 14, and the

7  uncontaminated Palermo Wells is approximately 2.4 times greater . . . . Therefore, with

8  transmission storage improvements, Tumwater should be able to meet its future peak demands . .

9  . ."); 1048074 (EPA Fact Sheet stating, "Two new drinking water wells have been developed and

10  are currently operating in the southwest area of Tumwater. These wells have replaced the water

11  supply lost due to the contamination of the Palermo Wellfield."). Finally, the conclusion does not

12  account for the City's blending of well water, the result of which was that water delivered to

13  customers did not exceed the MCL. *See* 1105220-0017 (Record of Decision notes that the City

14  analyzed composite samples), 1048079-0002 ("Because of the blending of water from several

15  wells, it is highly unlikely that blended water flowing into the distribution system from the

16  wellfield ever exceeded the standard.").[8]

17      The EPA's conclusion that the contamination would impact the quantity and quality of

18  well water actually delivered to customers is not supported by the record and fails to take into

19  account critically important aspects of the problem.

20          **c. High levels of hazardous substances or pollutants or contaminants in the soil largely at or near the surface, that may migrate.**

21

22      The EPA's consideration of the fourth factor also appears to be a significant component of

23  the EPA's conclusion that a removal action was warranted. The EPA concluded as follows:

24          VOC's, including TCE and PCE are observed in the soils and in the ground water on site.

25          Soils and ground water underlying and adjacent to the operating Southgate Dry Cleaner

26  ───────────────

    [8] These documents, the Record of Decision and a 1993 City of Tumwater press release, are not part of the
27  removal record. The Court has previously held that "consideration of supplemental materials is warranted to
    determine whether the EPA sufficiently considered all relevant factors and sufficiently explained its decision with
28  respect to the City's inability to meet demand for uncontaminated drinking water." Dkt. 152 at 9. These documents
    evidence the City's blending of well water and have been considered by the Court.

OPINION
Page 14

facility showed elevated levels of PCE volatile organic compounds (VOC) to 97,000 ppb PCE in soils (T5060310) at 2.5BGS and 26,000 ppb PCE in soils (T5060311).[9] Ground waters adjacent to the Southgate Dry Cleaners show elevated levels of PCE to 949.12j ppb (START, 1997). Ground water contamination in the Palermo Valley residential area near the corner of Rainier street and "O" street, approximately 600 feet west (upgradient) of the PWF wells, show levels of contamination to 824 ppb TCE (at 25 BGS) (Weston, 1996). Ground water contamination in the Palermo valley residential area at the eastern end of the "N" street (200 feet east of Palermo Avenue), approximately 200 feet north of the PFW [sic] wells, show 113.15j ppb TCE (START, 1996) in March, 1997, where "non-detect" levels were observed in 1995 in the ESI (Weston 1996). Historically, seeps in the Palermo neighborhood west of the Rainier Street houses are reported to have shown TCE at 48 ppb (CR01, Weston 1996) (also 27 and .64 ppb) and PCE at 81 ppb (CR01, Weston 1996) (also 32 ppb) (See Appendix II).

At 0-20 feet BGS in front of Southgate Mall's Southgate Dry Cleaner (5141 Capitol Blvd) and adjacent store fronts (video, hardware, beauty salon and toy stores), high PCE levels to 1,197 ppb PCE (97020752, VM-3 at 5 BGS) and commonly 100-1500 ppb PCE were detected, based on seven (7) test wells . . . split spoon sampled at five foot intervals (5, 10, 15, and 20 feet BGS) in the vadose zone.

1048496-0025. The EPA's conclusion with respect to threats to the environment is nearly identical but adds the following:

The site is within the Deschutes river drainage basin, which supports a variety of important marine species including the salmonids. Elevated levels of TCE (to 824 ppb) measured at the site in the ground water are of primary concern, as TCE is toxic to marine species. Acute marine water quality guidance level of TCE is 2,000 ppb.[10] Direct contact and inhalation to fauna and flora are pathways to the food chain.

1048496-0027-28. The EPA was concerned that the contamination was worsening, migrating toward the well field to contaminate the remaining wells, or both. For example, the 1997 Action Memorandum notes a "rapid increase of TCE observed at depth 70-90 BGS (80-100 feet above sea level) and east of the Palermo Bluff in seeps and ground water 0-35 BGS (80-110 ASL)."[11] 1048496-0023. The 1998 Action Memorandum contends that without a twelve month exemption, "the contaminant plumes will continue to migrate and continue to impact more ground waters used for human consumption." 1105726. Notably, the EPA apparently did not examine how much more time installation of the air strippers would have required if done as part

[9] "(South Gate Dry Cleaners Trip Report, TAT 1996)."

[10] "(NOAA Coastal Resource Coordinator correspondence, May 25, 1995)."

[11] "(See: Brewery City Pizza Removal Assessment, Ecology and Environment) (START 1997)."

OPINION
Page 15

1   of a remedial action rather than as a removal in determining that there was insufficient time to

2   conduct a remedial action.

3        The support for this conclusion falls into three, general categories: (1) the contaminant

4   plume was upgradient from the wells and groundwater generally flows in the direction of the

5   wells; (2) letters from various governmental officials expressed concern that the plume would

6   reach uncontaminated wells; and (3) data showed high concentrations of contaminants where

7   previous tests had revealed non-detect levels.

8   **i. Plume upgradient**

9        The parties agree that the contaminant plume was upgradient from the wells and that

10  groundwater in the area generally flows towards the well field, although they disagree as to the

11  precise path of the groundwater. While evidence that water generally tends to migrate from the

12  alleged contamination sources to the well field may be a sufficient basis to begin a remedial action,

13  it is unclear how this evidence may be used to support a time-sensitive removal. In other words,

14  the groundwater path does not evidence the *rate* of migration. The parties agree that at least some

15  of the contamination is traceable to events that occurred in 1970. Dkt. 154-1 at 5. The Court

16  therefore concludes that the record of evidence of groundwater flow does not demonstrate how

17  this contamination, of which the City and the EPA had been aware since 1993, became an urgent

18  concern in 1997.

19  **ii. Letters from governmental officials**

20       Several letters from governmental officials evidence a concern that contaminants would

21  migrate and infect the remaining wells: The City Administrator wrote a letter to the EPA in June

22  of 1996 stating, "[O]ur consultant believes that, under one scenario outlined in their comments of

23  May 31, 1996, TCE from the southernmost area of the identified plume may be headed for the

24  three contaminated wells that remain operational in the Palermo wellfield." 1048502. The

25  Director of the Environmental Health Division, Thurston County Department of Public Health

26  and Social Services wrote a letter in June of 1996 expressing a concern that "the contamination

27  will reach not only the remaining Tumwater wells, but other wells in the area causing further

28  public health implications to the users." 1044967. In July of 1996, the Director of the Washington

State Department of Ecology sent a letter to Governor Mike Lowry accompanied by briefing that included this assessment: "The threat to the drinking water supply at the Palermo Wellfield is an urgent problem that requires quick remedial actions." 1044974-0003. In August, Governor Lowry sent a letter to the EPA recommending that the Site be listed on the National Priority List in light of the Department of Ecology's conclusions and "the city's agreement on the need for emergency action to protect their drinking water supply." 1062752. These letters evidence various governmental officials' conclusions that the contaminant plume was expected to migrate towards and affect the well field. These conclusions are professedly or impliedly based upon scientific evidence but do not constitute scientific evidence themselves. While perhaps sufficient to justify further testing or other action at the Site, the Court concludes that these letters are an insufficient basis upon which to conclude that a removal action was necessary.

### iii. Worsening contamination

At trial, the United States pointed to the September 1993 Pacific Groundwater Group ("PGG") Summary Report as evidence that the contamination of the well field was persistent and followed a worsening trend. The PGG Report is based upon well water samples collected from August 12, 1993, to August 22, 1993. 1044992-0006. It is difficult to see how a report issued so soon after TCE was first discovered at the Palermo Wellfield can be said to justify emergency action years later. While the report does generally depict a pattern of increased contamination in Wells 2, 4, and 5, the pattern spans less than one month. *See* 1044992-0010. The PGG Report also has admitted limitations by virtue of being issued so soon after the contamination was discovered:

> All interpretations and recommendations are based on limited field data. The full extent of TCE in groundwater, and the source of TCE have not been characterized. The computer model used was not calibrated, the results of which are only estimates. The distribution and concentration of TCE in groundwater may increase or decrease in the future.

*See* 1044992-0005. In addition, the PGG Report does not appear to support the plaintiff's contention that uncontaminated wells were in jeopardy due to migration of the plume. *See id.* ("Computer modeling of a limited scope indicates that the clean wells are not likely to be impacted by the known TCE in the groundwater.").

1   Sampling of the three contaminated wells over a longer period of time shows fluctuating

2   levels of TCE in all wells. 1048496-0042. The changing levels in Well 2 may be characterized as

3   an upward trend. Wells 4 and 5 never had TCE concentrations above the MCL, and there are

4   several intervals during which sampling revealed non-detect levels for these wells. *Id.*

5   The only other evidence suggesting that the plume was migrating towards the well field is

6   of questionable reliability. The one data point identified as evidence of migration is Geoprobe 12

7   ("GP 12"). *See* 1048496-0096. It is located on N Street, east of Palermo Avenue. 1048496-0097.

8   Data from 1996 show TCE concentrations of 113.15j ppb 25 feet below ground at GP 12.

9   1048496-0025, 0070, 0096. At all other elevations, the TCE level for GP 12 was "20U."

10  1048496-0070, 0096, 0078 (According to the key, "U" means that "[t]he material was analyzed

11  for but not detected. The associated numerical value is the estimated sample quantitation limit.").

12  According to the 1997 Action Memorandum, this is the location where "'non-detect' levels were

13  observed in 1995 in the ESI [Expanded Site Inspection Report] (Weston 1996)." 1048496-0025.

14  To determine whether non-detect levels were indeed reported in this location in 1995, the Court

15  has attempted to locate the data supporting this statement.

16  Looking at the April 1996 Expanded Site Inspection Report ("ESI"), it appears that TCE

17  levels were non-detect near this location when tested during the Phase 1 investigation. *See*

18  1101484-0033 ("TCE (or PCE) was not detected in Phase 1 groundwater samples collected

19  approximately 100 feet north (station 43) and 50 feet south (Station 40)."). Phase 1 occurred in

20  October and November of 1994, not 1995 as suggested by the Action Memorandum. 1101484-

21  0012. Sampling Station 43 is located on Rainier Avenue between N Street and O Street and to the

22  west of GP 12. Sampling Station 40 is located on Rainier Avenue near the corner of O Street and

23  to the west of GP 12. Because the 1997 Action Memorandum's reference to the ESI is vague and

24  because the samples being compared appear to be from different locations, it is unclear whether

25  this data truly indicates the presence of TCE where none was detected before.

26  The WSDOT contends that this data is insufficient for several reasons. First, the WSDOT

27  contests the reliability of the 1996 GP 12 data because it is not from, or verified by data from, a

28  commercial lab. The 113.15j ppb reading in 1996 is from a mobile field lab, which Tony C. Mathis

1   testified is less reliable than a commercial lab due to the mobility and size of the mobile lab and to

2   the mobile lab's unstable power source. *See* 1048496-0070. There is no commercial lab data with

3   which to compare the reading. *See id.* To demonstrate the risk of inaccuracy associated with

4   mobile labs, the WSDOT points to GP 13. In 1996, the mobile lab detected 56 ppb of TCE, but

5   the commercial lab did not detect any TCE at GP 13. *See id.* (Commercial lab data point is 1U.).

6   This evidence casts some doubt on the reliability of the mobile lab data for GP 12. At trial, the

7   United States did not offer a basis for relying upon the data for GP 12. Accordingly, the Court

8   finds from credible testimony at trial that data from mobile labs is less reliable than data from

9   commercial labs.

10          Second, the WSDOT contends that it is impossible to make true comparisons of data from

11   a Geoprobe sample because such Geoprobe samples are one-time samples that cannot be retested.

12   The WSDOT contended that there was no monitoring well or fixed data point installed to enable a

13   true comparison. The United States did not point to similar data points or other evidence

14   demonstrating that TCE was detected in areas that had previously reported non-detect levels.

15          Third, the WSDOT contends that the 113.15j ppb reading from GP 12 is merely an

16   estimate that should not be relied upon. According to the key for Geoprobe data, "J" means that

17   "the associated Numerical value is an estimated quantity because the reported concentrations

18   were less than the contract required detection limits or because quality control criteria limits were

19   not met." 1048496-0078. This explanation of the data provides reason to doubt the reliability of

20   this data point. The United States did not offer other concrete evidence of migration to refute the

21   WSDOT's position in this regard.

22          Fourth, the WSDOT contends that there is also data showing non-detect TCE levels in

23   locations where TCE had previously been detected. The 1997 Action Memorandum notes this

24   change in the data:

25          Historically, seeps in the Palermo neighborhood west of the Rainier Street houses are
            reported to have shown TCE . . . . March, 1997 sampling events of the seeps in the
26          Palermo neighborhood west of the Rainier Street houses were unable to replicate the
            results and showed non-detect levels for TCE and PCE . . . .

27

28   1048496-0011.

1    Finally, the WSDOT contends that the EPA's reliance on this particular sample to justify

2  installation of an air stripper is arbitrary and capricious because the sample reflects TCE levels in

3  soil rather than groundwater. At trial, the WSDOT made this contention as part of its closing

4  argument and did not offer factual support. The GP 12 sample in question was taken at a depth of

5  25 feet. 1048496-0096. According to the ESI, shallow groundwater is located 25-70 feet below

6  the surface. 1101484-0023. The Court therefore finds that the sample taken from GP 12

7  represents a groundwater sample and not a soil sample.

8                          **iv. Conclusion**

9    The EPA's determination that the contamination plume was migrating and may imminently

10  and substantially impact the uncontaminated wells, a critical aspect of its decision to initiate a

11  removal action, is not supported by the administrative record. Evidence referenced in support of

12  the 1997 Action Memorandum, by the EPA in the memorandum itself and by the United States at

13  trial, demonstrates, at most, that the plume was moving in the general direction of the well field

14  and had been for many years. There is no evidence of how much time installation of the air

15  strippers as a remedial action, rather than as a removal action, would have required. There is no

16  evidence that the actual or potential rate of the migration was such that the EPA did not have time

17  to comply with the procedural steps required of remedial actions. Evidence in the record

18  demonstrates that contamination levels were fluctuating, but evidence that contaminant levels

19  were increasing in any particular location is weak. Finally, data from GP 12 are insufficient to

20  demonstrate that the plume was migrating because they are based upon an estimation and they are

21  uncorroborated by more reliable commercial lab data.

22              **d. Weather conditions that may cause hazardous substances or pollutants or
              contaminants to migrate or be released**

23    The EPA determined that weather conditions at the Site may cause the migration or

24  release of contaminants. The majority of the EPA's consideration of the fifth factor consists of

25  data showing contamination levels at various locations and depths. The only discussion of weather

26  conditions is as follows:

27    The area experiences heavy rains which provide physical movement of pollutants and
      contaminants in the groundwater toward PWF. The PWF is in the 100 year flood plain of

28

1
2
3
4

the Deschutes river. The water plus sediment sample analyses results indicate volatile organic chemical levels in wells located on site that may migrate. Contaminants are observed in the shallow soils near the surface to the shallow ground water and in the ground water observed two to five feet BGS in Palermo Valley and 35 feet BGS in Southgate Mall. . . . The area commonly receives rainfall that enters the site surface area and the shallow and intermediate unconfined aquifers.

5   1048496-0026. The WSDOT maintains that this evidence, if sufficient, would render removal

6   actions appropriate for any cleanup sites in the Pacific Northwest.

7          This discussion of the weather conditions at the Site does not reference any data. More

8   specifically, the Action Memorandum does not reference data demonstrating that the rainfall at

9   the Site is "heavy," that the nature of subsurface soils had the effect of causing rainwater to

10  migrate, that the effect of rainfall is to move contaminants, or that such movement of

11  contaminants is in the direction of the well field. The Court therefore finds and concludes that the

12  Action Memorandum fails to offer a satisfactory explanation for its conclusion that weather

13  conditions may cause the contaminant plume to migrate or be released.

14                **e. Conclusion on the EPA's Decision to Conduct a Removal Action**

15         The EPA's examination of the factors to be considered before instituting a removal action

16  does not include extensive documentation of the EPA's reasoning and the specific threats

17  underlying that reasoning. While much of the EPA's analysis references scientific evidence in the

18  record, the evidence cited is often of little or no relevance to the overall question of whether the

19  conditions at the Site were such that cleanup, in the form of a *time-sensitive removal*, was

20  appropriate.

21         With regard to the first factor (actual or potential exposure to nearby human populations,

22  animals, or the food chain from hazardous substances or pollutants or contaminants), the Court

23  finds that the EPA's findings are conclusory and unsupported by the record.

24         With regard to the second factor (actual or potential contamination of drinking water

25  supplies or sensitive ecosystems), the Court finds that the EPA's determination that the City could

26  not meet demands for clean drinking water lacks support and is contradicted by evidence that the

27  City installed new wells that more than made up for the lost pumping capacity of the

28  contaminated wells. The Court finds and concludes that the EPA entirely failed to consider the

OPINION
Page 21

1    City's blending of well water and failed to determine whether water actually delivered to

2    customers ever exceeded the MCL.

3           With regard to the fourth factor (high levels of hazardous substances or pollutants or

4    contaminants in soils largely at or near the surface, that may migrate), the Court finds that the

5    EPA relied primarily on one piece of data and that reliance on this data point alone was unjustified

6    because the sample was analyzed only by a mobile lab and was merely an estimate. The EPA

7    apparently made no effort to determine when the plume could be expected to reach the well field,

8    did not consider how much time would be required to conduct a remedial action and whether it

9    could afford to take such action, and has not demonstrated that the urgency of the situation

10   rendered such inquiries impractical.

11          Finally, the Court finds that the EPA's consideration of the fifth factor (weather conditions

12   that may cause hazardous substances or pollutants or contaminants to migrate or be released)  is

13   similarly conclusory and lacks support in the record. The Court therefore concludes that the

14   EPA's decision to initiate a removal action at the Site, based upon its considerations of the factors

15   in the NCP at 40 C.F.R. §300.415(b), was arbitrary and capricious.

16          **2. Characterization as Removal**

17          At the second step of the analysis, even if the EPA's removal action had not been arbitrary

18   and capricious, the action taken by the EPA must be properly characterized as a removal action.

19   *See W.R. Grace & Co.*, 429 F.3d at 1233. CERCLA and the National Contingency Plan divide

20   response actions into two categories: removal actions and remedial actions. *Id.* at 1237. Removal

21   actions are "time-sensitive responses to public health threats for which the EPA is granted

22   considerable leeway in structuring the cleanup." *Id.* at 1228. Remedial actions, on the other hand,

23   are "permanent remedies to threats for which an urgent response is not warranted." *Id.* at 1238.

24   Distinguishing between removal and remedial actions is critical under CERCLA because the

25   requirements for remedial actions are more detailed and onerous. *Id.* at 1226.

26          Whether the air strippers fall within the statutory definitions of removal action or remedial

27   action is a question of statutory interpretation. *See id.* at 1233. In reviewing an agency's

28   construction of the statutes it administers, the court engages in a two step inquiry. First, the court

1  determines whether Congress has directly spoken to the issue. If so, the court gives effect to
2  Congress' unambiguous expression of intent. *Id.* at 1236. If not, the court employs the EPA's
3  construction of the statute. *Id.* at 1236-37. At a minimum, the EPA's classification is afforded
4  "modified deference." *Id.* at 1237. The Ninth Circuit has determined that Congress has not clearly
5  differentiated between removal and remedial actions. *Id.* at 1241. The Court's analysis therefore
6  begins at the second step to determine whether the EPA's classification of the well field air
7  strippers comports with the EPA's definition of removal actions.

8      According to the EPA's interpretation, the difference between removal and remedial
9  action is "whether the **exigencies** of the situation were such that the EPA did not have time to
10 undertake the procedural steps required for a remedial action, and, in responding to such a
11 **time-sensitive** threat, the EPA sought to minimize and stabilize **imminent** harms to human health
12 and the environment." *Id.* (emphasis added). To determine whether the action was properly
13 characterized as a removal action, courts may consider the time-sensitivity of the conditions at the
14 site, the interplay between removal and remedial actions at a single site, and whether the action
15 comports with the examples listed in 40 C.F.R. §300.415(e). *See id.* Courts may also consider the
16 duration and permanence of the response, but these factors should be afforded less weight. *See id.*
17 at 1244-45. This inquiry merits a "comprehensive view of the administrative record." *See id.*

18          **a. Time Sensitivity**

19     The WSDOT contends that the threat posed by the contaminant plume was not time
20 sensitive or immediate. This contention is primarily based upon the fact that contaminants were
21 first discovered by the City in 1993 and that the EPA did not recommend a removal action until
22 1997. The parties have not articulated how much more time installation of the air strippers would
23 have required if done as part of a remedial action rather than as a removal. While the 1997 Action
24 Memorandum does cite data from 1996 and 1997, it does not articulate why this data justified a
25 removal, rather than a remedial action. The evidence that the contaminants were migrating or that
26 contaminant levels were increasing, addressed in more detail above, is thin at best and does not
27 suggest that the conditions at the Site justified an emergency response or that the EPA did not
28 have time to take the procedural steps required of a remedial action. The Court therefore finds

OPINION
Page 23

1   and concludes, on the basis of the administrative record, that the well field contamination at the

2   Site did not pose an imminent threat justifying a removal action.

### b. Interplay Between Removal and Remedial Actions

4        Where an alleged removal is followed by remedial measures, the initial action

5   may be properly characterized as a removal because the NCP contemplates progression from

6   removal to a comprehensive remedial plan. *See W.R. Grace & Co.*, 429 F.3d at 1242-43. Here,

7   the Action Memorandum seems to contemplate progression to remedial action: "This emergency

8   action contributes toward the necessary steps to stabilize the site. The well head treatment and

9   on-site soil vapor extraction treatment system options require continued operation and

10  maintenance to stabilize contamination for an undetermined period of time." 1048496-0029. With

11  respect to contaminated drinking water, the EPA's selected remedy was to continue operation of

12  the air stripping system and establish a long term groundwater monitoring system. 1105220-0125-

13  26. While the distinction between the air strippers as a removal and as a remedy is arguably

14  superficial, installation of the air stripper did pave the way for ongoing water treatment at the Site.

15  The Court therefore concludes that the interplay between the removal and remedial actions

16  suggests that characterization of the air strippers as both a removal and a remedy was proper in

17  this regard.

### c. Examples in 40 C.F.R. §300.415(e)

19        The NCP provides a non-exhaustive list of activities generally considered removal actions:

20  (e) The following removal actions are, **as a general rule**, appropriate in the types of
    situations shown; however, **this list is not exhaustive** and is not intended to prevent the

21  lead agency from taking any other actions deemed necessary under CERCLA, CWA
    section 311, or other appropriate federal or state enforcement or response authorities, and

22  the list does not create a duty on the lead agency to take action at any particular time:

23        (1) Fences, warning signs, or other security or site control precautions--where
          humans or animals have access to the release;

24

25        (2) Drainage controls, for example, run-off or run-on diversion--where needed to
          reduce migration of hazardous substances or pollutants or contaminants off-site or
          to prevent precipitation or run-off from other sources, for example, flooding, from

26        entering the release area from other areas;

27        (3) Stabilization of berms, dikes, or impoundments or drainage or closing of
          lagoons--where needed to maintain the integrity of the structures;

28

(4) Capping of contaminated soils or sludges--where needed to reduce migration of hazardous substances or pollutants or contaminants into soil, ground or surface water, or air;

(5) Using chemicals and other materials to retard the spread of the release or to mitigate its effects--where the use of such chemicals will reduce the spread of the release;

(6) Excavation, consolidation, or removal of highly contaminated soils from drainage or other areas--where such actions will reduce the spread of, or direct contact with, the contamination;

(7) Removal of drums, barrels, tanks, or other bulk containers that contain or may contain hazardous substances or pollutants or contaminants--where it will reduce the likelihood of spillage; leakage; exposure to humans, animals, or food chain; or fire or explosion;

(8) Containment, treatment, disposal, or incineration of hazardous materials-- where needed to reduce the likelihood of human, animal, or food chain exposure;

or

(9) Provision of alternative water supply--where necessary immediately to reduce exposure to contaminated household water and continuing until such time as local authorities can satisfy the need for a permanent remedy.

40 C.F.R. §300.415(e) (emphasis added). The air stripping system does not appear to fall within this list. The plaintiff contends that the air strippers are analogous to the last example (provision of alternative water supply). In the Action Memorandum, air stripping is referred to as a "remedy alternative." 1048496-0030. Consideration of this factor suggests that the air stripping system was not properly classified as a removal, but the exclusion of air strippers from a non-exhaustive list of possible removal actions is not particularly persuasive.

### d. Duration and Permanence

Removal actions ordinarily last for only a short duration, but this is not always the case. *See W.R. Grace & Co.*, 429 F.3d at 1244. Similarly, removal actions may involve permanent solutions. Rather than classifying a temporary solution of short duration as a removal action, courts should look for "interim or partial response actions that are focused on immediate risk reduction" to distinguish removal action from remedial action. *See id.* 1245. Here, it is uncontested that the air stripping system was of long duration and appears aimed not at merely an interim or partial response but at putting in place a solution that would later form the bulk of the

1   selected remedial action. This factor weighs against classifying the air stripping system as a

2   removal action.

3               **e. Conclusion**

4               Based upon the foregoing discussion, the Court concludes that the air strippers were

5   improperly characterized as a removal action. The air strippers are not explicitly listed as an

6   example of a removal action in 40 C.F.R. §300.415(e) and do not constitute an "interim or partial

7   response." These factors are of little weight as compared to the other factors and are of limited

8   relevance to the Court's conclusion.

9               While the Court concludes that the installation of the air strippers as a removal action

10  paved the way for continued operation of the air strippers as a remedy, this factor too is of limited

11  importance as compared to the time-sensitivity factor. The Court finds that the situation at the

12  Site was not urgent or time sensitive and concludes that this factor is of paramount importance in

13  determining whether the installation of the air strippers was properly classified as a removal.

14  Having found that the threat was not time-sensitive, the Court therefore concludes that the

15  installation of the air strippers was improperly characterized as a removal action.

16              **3. Award of Response Costs**

17              Having determined that the EPA's decision to conduct a removal was arbitrary and

18  capricious and that the air strippers were improperly characterized as a removal action rather than

19  as a remedy, the Court's next task is to determine what portion of the response costs attributable

20  to the removal, if any, the WSDOT must pay. The standards for this stage of the analysis are

21  governed by statute:

22              (3) Remedy
            If the court finds that the selection of the response action was arbitrary and capricious or
23          otherwise not in accordance with law, the court shall award (A) only the response costs or
            damages that are not inconsistent with the national contingency plan, and (B) such other
24          relief as is consistent with the National Contingency Plan.

25

26

27

28

OPINION
Page 26

(4) Procedural errors
In reviewing alleged procedural errors, the court may disallow costs or damages only if the errors were so serious and related to matters of such central relevance to the action that the action would have been significantly changed had such errors not been made.

42 U.S.C. §9613(j)(3),(4). The WSDOT appears to concede that it is liable for certain monitoring costs but has not identified which of the costs associated with the air strippers should be disallowed. *See* Dkt. 101 at 19 ("[C]ertainly further monitoring of the water was appropriate. . . . It was not reasonable, necessary, or justifiable to incur several million dollars in cleanup costs . . . .").

This case presents a somewhat unique question because it involves a disputed removal that was also implemented as a remedy. As presented to the Court, the record does not support a finding that the air stripper portion of the *remedial* action was improper or would not have occurred if not for the EPA's installation of air strippers as part of the removal. In this sense, this case is distinguishable from *Washington State Dept. of Transp.*, 59 F.3d 793, in which the court denied recovery of all response costs for failure to comply with the NCP. Here, the EPA did comply with the NCP only with respect to the *continued operation* of the air strippers as a *remedial* action. The WSDOT is therefore in the difficult position of having to demonstrate what portion of the response costs is attributable only to the air stripper as a removal action and not as a remedial action. In other words, the WSDOT is charged with proving what harm it suffered as a result of the installation of the air stripper as a removal action when the installation of the air stripper as a remedy was proper. The WSDOT has not demonstrated which portion of the air stripper costs, if any, is attributable to only the removal.

The WSDOT apparently attempts to avoid contesting particular response costs by contending that the air stripper would have been deemed unnecessary as a remedy if the SVE system had been allowed to operate first to remove contaminants from the soil. Dkt. 154-1 at 7, 167-1 at 8. At trial, Michael Riley testified that the plume may have dissipated on its own as a result of the SVE. This speculation is not a sufficient basis for disallowing all costs of the air stripper because it is simply impossible to know whether the air stripper would eventually have been installed as a proper remedial action without evidence that the EPA's selection of the air

1  stripper as a *remedy* was itself improper or that the SVE would have completely eliminated any

2  need for the air stripper. The Court is therefore unable to determine what portion of the response

3  costs the United States may recover. The parties should be afforded an opportunity to provide

4  briefing as to what portion of the response costs is recoverable in light of the Court's

5  determination that selection of the air strippers as a removal action was arbitrary and capricious

6  and that characterization of the air strippers as a removal was improper.

7  **B. REMEDIAL ACTION**

8       The requirements for remedial actions are more detailed and onerous than those for

9  removal actions. *See, e.g., W.R. Grace & Co.*, 429 F.3d at 1226; 40 C.F.R. §§300.425, 300.430.

10  The french drain is the only remedial action contested by the WSDOT. Rather than contend that

11  the EPA failed to comply with procedural requirements, the WSDOT contends that it should not

12  be held responsible for costs associated with the french drain for two reasons: (1) the selection of

13  the french drain was based upon inadequate data, rendering the decision arbitrary and capricious

14  and (2) the costs of the french drain are divisible and not attributable to the WSDOT.

15       **1. Arbitrary and Capricious or Otherwise not in Accordance with Law**

16       The EPA's selection of the french drain as part of the remedial action must be upheld

17  unless the defendant demonstrates on the administrative record that the decision was arbitrary and

18  capricious or otherwise not in accordance with law. *See* 42 U.S.C. §9613(j)(2).

19       In the Record of Decision, the EPA identified the risk of inhalation of PCE or TCE vapors

20  emitted from standing groundwater:

21       The second RAO [Remedial Action Objective] for protection of human health is
      prevention of inhalation of vapors containing TCE or PCE potentially emitted by

22       groundwater seepage (surface water) that ponds within the crawlspaces of the residences
      along the west side of Rainier Avenue. Sampling has shown that the standing water under

23       some of these residences contains TCE and PCE. Modeling has demonstrated that an
      excess cancer risk from inhalation exists because vapors from this standing water have the

24       potential to migrate into the living spaces of the homes at levels that can cause adverse
      health effects. . . .

25

26       Modeling indicates that lowering the groundwater table to a depth of at least 18 inches
      below the bottom of the crawlspaces will reduce potential risks to acceptable levels.

27  1105220-0054-55.

28

OPINION
Page 28

1    Testing in March of 1997 revealed no detectable levels of TCE and PCE in the standing

2  water of residential crawlspaces. 1048496-0017. This testing was conducted with a

3  photoionization detector ("PID"), which had an estimated detection limit of 1 part per million

4  ("ppm"). 1101038-0260. This is well above the Acceptable Source Impact Levels:

5       [T]he PID may not have been able to read concentrations of chemicals in air if present
        below 1 ppm. Acceptable Source Impact Levels (ASILs) for PCE and TCE are 1.1 $\mu$g/m$^3$
6       and .59 $\mu$g/m$^3$, respectively, as provided in WAC 173-460-150. For PCE, 1 ppm is
        approximately 6,800 $\mu$g/m$^3$ and approximately 5,300 $\mu$g/m$^3$ for TCE. Since the PID may
7       have only been capable of reading at least 1 ppm in air, the potential presence of PCE and
        TCE in these homes could have been overlooked, even at the PSAPCA levels of health
8       concern. The inability to detect indoor air concentrations less than 1 ppm in this air
        monitoring study represents a data gap; since the detection limit of 1 ppm was not
9       sufficiently low enough [sic]. In addition, only one sampling event ever took place under
        the homes.
10
11 1101038-0260-61 (Final Remedial Investigation Report). The EPA used surface water

12 concentrations of PCE and TCE to model and predict indoor concentrations of chemicals in air

13 and determine the potential risk of inhalation of such chemicals. *See* 1101038-0275-81. To

14 address this risk, the EPA chose installation of a french drain as a remedy. The french drain is

15 designed to collect shallow groundwater, route it towards the Tumwater Municipal Golf Course,

16 treat the water by aeration in a lagoon, drain the water through a stormwater ditch, and discharge

17 the water into the Deschutes River. 1105220-0125.

18    The WSDOT has maintained that selecting a remedial action based upon an estimated risk

19 of inhalation of volatile chemicals is arbitrary and capricious and contends that the EPA should

20 have conducted further tests to confirm its estimations. Dkt. 101 at 14-15. While the EPA could

21 have done more to determine the precise nature and extent of the risk of inhalation of volatile

22 chemicals from water in crawlspaces, that alone does not demonstrate that the EPA was arbitrary

23 and capricious. The EPA's selection of the french drain as a remedy to address the risk of

24 inhalation of PCE and TCE was adequately supported by the record and was not arbitrary and

25 capricious.

26 ### 2. Joint and Several Liability or Divisibility

27    Even though the WSDOT fails to demonstrate that the EPA's installation of the french

28 drain was arbitrary and capricious or otherwise not in accordance with law, the WSDOT may

1  avoid responsibility for some, or all, of the costs associated with the french drain if the divisibility

2  doctrine applies. As a threshold matter, the Court must determine whether the WSDOT has

3  properly preserved this defense.

4       **a. Waiver**

5     The plaintiff contends that the WSDOT is barred from asserting divisibility as an

6  affirmative defense because it was not raised in the answer or the Pretrial Order. Dkt. 116-1 at 25.

7  The divisibility doctrine is an affirmative defense that, if successful, precludes liability. *See U.S. v.*

8  *Mottolo*, 26 F.3d 261, 263 (1st Cir. 1994). As such, it must be raised in the answer. *See* Fed. R.

9  Civ. P. 8(c) ("In pleading to a preceding pleading, a party shall set forth affirmatively . . . any

10  other matter constituting an avoidance or affirmative defense."). In a section labeled "Affirmative

11  Defenses," the WSDOT's answer states as follows: "The releases or threatened releases of

12  hazardous substances at the site, if any, and the costs incurred by the Plaintiff, if any, were

13  proximately caused by the actions and/or omissions of third persons over whom this Defendant

14  had no control." Dkt. 10-1 at 5. Though it does not employ the term "divisibility," this statement

15  is sufficient to put the plaintiff on notice of this defense. The Court therefore concludes that the

16  WSDOT did not waive the issue of divisibility for failure to affirmatively plead the defense in the

17  answer.

18     The plaintiff also contends that the WSDOT cannot raise divisibility as an affirmative

19  defense because it was not identified in the Pretrial Order. Dkt. 116-1 at 25. Federal Rule 16(e)

20  governs Pretrial Orders and provides as follows:

21      Pretrial Orders. After any conference held pursuant to this rule, an order shall be entered
    reciting the action taken. This order shall control the subsequent course of the action
22      unless modified by a subsequent order. The order following a final pretrial conference shall
    be modified only to prevent manifest injustice.
23

24  Fed. R. Civ. P. 16(e).  Pretrial orders play an important role in limiting issues for trial:

25      [A] party need offer no proof at trial as to matters agreed to in the order, nor may a party
    offer evidence or advance theories at the trial which are not included in the order or which
    contradict its terms. Disregard of these principles would bring back the days of trial by
26      ambush and discourage timely preparation by the parties for trial.

27  *U.S. v. First Nat. Bank of Circle*, 652 F.2d 882, 886 (9th Cir. 1981). A pretrial order has the

28  effect of amending the pleadings and controlling the course of litigation. *Northwest Acceptance*

OPINION

1   *Corp. v. Lynnwood Equipment, Inc.*, 841 F.2d 918, 924 (9th Cir. 1988). A defendant must

2   enumerate its defenses, even where the plaintiff bears the burden of proof. *El-Hakem v. BJY Inc.*,

3   415 F.3d 1068, 1077 (9th Cir. 2005), *cert. denied*, 126 S.Ct. 1470 (2006); *Northwest Acceptance*

4   *Corp.*, 841 F.2d at 924 (defense waived where it was not raised in the pretrial order or before

5   trial).

6           A pretrial order should be liberally construed to allow theories at trial that are at least

7   implicitly included in the order. *See First Nat. Bank of Circle*, 652 F.2d at 886. A defense is

8   preserved if the pretrial order makes some reference to the defense such that the other party

9   should have been alerted to, and prepared for, assertion of the defense. *See El-Hakem*, 415 F.3d

10  at 1077. In its discretion, the trial court may modify a pretrial order based upon consideration of

11  four factors: (1) the degree of prejudice resulting from a failure to modify; (2) the degree of

12  prejudice resulting from a modification; (3) the impact of a modification at that stage of the

13  litigation on the orderly and efficient conduct of the case; and (4) the degree of willfulness, bad

14  faith, or inexcusable neglect on the part of the party seeking modification. *See id.* The trial court

15  may implicitly exercise this discretion by allowing a party to advance theories not contained in the

16  pretrial order. *See El-Hakem*, 415 F.3d at 1077.

17          In this case, the Pretrial Order did not explicitly identify divisibility as an affirmative

18  defense. *See* Dkt. 154-1 at 2 (affirmative defenses). The Pretrial Order identifies the WSDOT's

19  affirmative defenses as follows: "Defendants will pursue the following affirmative defenses: (1)

20  Plaintiff cannot show that a release of TCE from the WSDOT facilities caused the incurrence of

21  response costs. (2) Plaintiff's actions were inconsistent with the national contingency plan." *Id.*

22  Later in the Pretrial Order, the WSDOT makes the following contentions:

23          11. The historical review of potential sources is limited and failed to identify likely
            additional sources of PCE and TCE. EPA failed to identify and consider former septic
24          leach fields located throughout the areas upgradient of the well field and failed to consider
            the widespread historical uses of TCE.
25
            . . .
26
            14. Biodegradation of TCE to PCE is occurring at the Site. TCE in the Palermo
27          Valley originated from the breakdown of PCE released at area drycleaners.

28          15. The contributions of TCE from the WSDOT MTL and former lab were not

OPINION
Page 31

1   sufficient to result in the concentrations of TCE detected in the Palermo Valley.

2   16. The Brewery City Pizza location is a source of PCE and/or TCE.

3   17. Releases of PCE and/or TCE at the Southgate Dry Cleaners and Brewery City
    Pizza locations are the primary source of TCE and PCE observed in the surface water
4   seeps at the base of the Palermo Valley bluff and groundwater in the Palermo Well Field.
    TCE in the seeps and well field is a result of TCE being released at the Southgate Mall
5   area, and/or some portion of the PCE has been converted to TCE by biological activity.

6   18. The amount of TCE in the soil at the WSDOT former lab is estimated to be 0.6
    pound based on EPA test results.
7
    *Id*. at 8.
8
        Liberally construed, these excerpts of the Pretrial Order implicitly encompass the
9
    WSDOT's assertion of the divisibility defense such that the United States should have been
10
    alerted to, and prepared for, the WSDOT's assertion of the defense at trial. Moreover, the Court
11
    implicitly modified the Pretrial Order at trial by allowing the WSDOT to offer evidence
12
    demonstrating that at least some of the TCE intercepted by the french drain is not attributable to
13
    the WSDOT facilities. The plaintiff had an opportunity to rebut the WSDOT's divisibility
14
    evidence and to respond to the divisibility argument. The divisibility defense is therefore properly
15
    before the Court.
16
            **b. Divisibility**
17
        Having determined that the WSDOT preserved the issue of divisibility, the Court must
18
    determine whether divisibility is appropriate in this case. Liability under CERCLA is joint and
19
    several, subject to the statutory defenses set forth in 42 U.S.C. §9607(b). *See, e.g.*, *Carson*
20
    *Harbor Village,*, 270 F.3d at 871 ("Once liability is established, the defendant may avoid joint and
21
    several liability by establishing that it caused only a divisible portion of the harm-for example, it
22
    contributed only a specific part of the hazardous substances that spilled."); *Montrose Chemical*
23
    *Corp. of California*, 104 F.3d at 1518 n.9. The imposition of joint and several liability can have
24
    harsh results and is not appropriate in every case:
25
        CERCLA, as a strict liability statute that will not listen to pleas of "no fault," can be
26      terribly unfair in certain instances in which parties may be required to pay huge amounts
        for damages to which their acts did not contribute. Congress recognized such possibilities
27      and left it to the courts to fashion some rules that will, in appropriate instances, ameliorate
        this harshness. Accordingly, Congress has suggested, and we agree, that common-law
28      principles of tort liability set forth in the *Restatement* [*(Second) of Torts*] provide sound

1  guidance.

2  *See Matter of Bell Petroleum Services, Inc. v. Sequa Corp.*, 3 F.3d 889, 897 (5th Cir. 1993). In

3  other words, joint and several liability is not mandatory. *See id.* at 902 n.13. The *Restatement*

4  provides as follows:

5        (1) Damages for harm are to be apportioned among two or more causes where

6              (a) there are distinct harms, or

7              (b) there is a reasonable basis for determining the contribution of each cause to a
                 single harm.

8

9        (2) Damages for any other harm cannot be apportioned among two or more causes.

10  Restatement (Second) of Torts §433A (1965). As a polluting party, the WSDOT bears the burden

11  of demonstrating that there is a reasonable basis for apportioning the harm. *See U.S. v. Alcan*

12  *Aluminum Corp.*, 990 F.2d 711, 722 (2d Cir. 1993). This is a heavy burden to bear. *See O'Neil v.*

13  *Picillo*, 883 F.2d 176, 178-79 (1st Cir. 1989). ("[R]esponsible parties rarely escape joint and

14  several liability, courts regularly finding that where wastes of varying (and unknown) degrees of

15  toxicity and migratory potential commingle, it simply is impossible to determine the amount of

16  environmental harm caused by each party."). The WSDOT may meet its burden by demonstrating

17  the "relative toxicity, migratory potential, degree of migration, and synergistic capacities of the

18  hazardous substances at the site." *See Alcan Aluminum Corp.*, 990 F.2d at 722. Commingled

19  harm may still be divisible and capable of reasonable apportionment. *See id.*

20         At trial, the crux of the WSDOT's argument with respect to the remedial action was that

21  the french drain intercepted contaminants that are not attributable to WSDOT releases. The

22  Court's findings with respect to whether the harm is divisible are bound by the Pretrial Order, in

23  which the parties agreed to the following pertinent facts:

24        6. [B]oth TCE and PCE are present in seeps at the base of Palermo Bluff and in shallow
           groundwater in the residential area in the Palermo Valley just west of the Wellfield.

25        . . .

26        16. The ROD also called for the construction of a subdrain system to collect groundwater
           containing TCE and PCE that is surfacing in the area of residences at the base of Palermo
27         Bluff.

28        . . .

1  24. The tank received waste, including TCE, for several months after its installation at the
2  current MTL. The tank overflowed in 1970, apparently due to a plumbing mistake, and
   the quantity that overflowed from the tank is unknown."

3  Dkt. 154-1 at 3-5.

4  The WSDOT offers three main arguments in support of its divisibility defense. First, the

5  WSDOT contends that the amount of TCE released from WSDOT facilities was minimal. More

6  specifically, the WSDOT contends that the concentration of TCE is one ounce at the current lab

7  and .6 pounds at the former lab. Dkt. 154-1 at 8. The WSDOT does not explain how this data

8  affects its liability for response costs associated with the french drain.

9  Second, the WSDOT contends that releases from WSDOT facilities travel at a very deep

10 level in order to reach the well field and therefore would not be at a shallow enough level to be

11 intercepted by the french drain. At trial, Michael Riley testified that the plume is forced downward

12 at the unpaved cloverleaf near I-5 and that some of the TCE plume is captured by the french drain

13 and some continues towards the well field. Even with the aid of expert testimony, the record does

14 not demonstrate the extent to which contaminants captured by the french drain are attributable to

15 the WSDOT or to other responsible parties.

16 Third, the WSDOT contends that TCE treated by the french drain is the result of

17 degradation of PCE to TCE and not attributable to the WSDOT. Dkt. 167-1 at 9-11. At trial,

18 Tony C. Mathis testified that at least some TCE at the Site may be attributable to degradation of

19 PCE to TCE. Dimitri Vlassopoulos, Ph.D. testified on behalf of the United States that

20 degradation of PCE to TCE was only a minor source of TCE. The Expanded Site Inspection

21 Report notes the possibility that degradation of PCE was occurring. It notes that "[t]he

22 commingled and stratified nature of the PCE and TCE plumes east of I-5 may be a result of . . .

23 [d]egradation of PCE to TCE . . . ." 1101484-0037. It also acknowledges that "[t]he absence of

24 PCE detections in the City of Tumwater municipal wells may be explained using the following

25 scenarios: (a) PCE has not reached the capture zone of the wells, or (b) PCE is completely

26 degraded to TCE and related breakdown products by the time it is drawn at the wellheads."

27 1101484-038.

28

1    Even if the Court accepts all of these assertions as true, the WSDOT fails to meet its high

2  burden to provide a reasonable basis for apportioning the harm. The Court finds that not all of the

3  TCE at the Site is attributable to releases from WSDOT facilities. This finding is an insufficient

4  basis for applying the divisibility doctrine, however. There is no evidence demonstrating how

5  much of the contamination in the french drain is attributable to the WSDOT or how to fairly

6  apportion some or none of the response costs to the WSDOT. The Court therefore concludes that

7  the harm caused by the contamination at the Site cannot be reasonably apportioned and that,

8  instead, joint and several liability for the entire harm is appropriate.

9  **C. DECLARATORY JUDGMENT**

10    In an action for recovery of response costs, "the court **shall** enter a declaratory judgment

11  on liability for response costs or damages that will be binding on any subsequent action or actions

12  to recover further response costs or damages." 42 U.S.C. §9613(g)(2) (emphasis added). The

13  Court should therefore enter a declaratory judgment that WSDOT is liable for response costs

14  consistent with the National Contingency Plan to be incurred by the United States in responding

15  to the release of hazardous substances at the Site, pursuant to Section 113(g)(2) of CERCLA, 42

16  U.S.C. §9613(g)(2).

17  **D. CONCLUSION**

18    Aided, in part, by the parties' briefing and argument, the Court has reviewed the Certified

19  Remedial Administrative Record, Certified Removal Administrative Record, and certain

20  supplemental materials attached hereto. From this review, the Court concludes that the EPA's

21  decision to conduct a removal action at the Palermo Wellfield, in light of the City's actions in

22  taking the contaminated wells offline, was arbitrary and capricious. In support of this holding, the

23  Court finds and concludes as follows:

24    •    The Court finds and concludes that the EPA did not offer a satisfactory
          explanation for its determination that there was actual or potential exposure to
25        nearby human populations, animals, or the food chain.

26    •    The Court finds that the EPA's conclusions that the City could not meet demands
          for clean drinking water were unsupported by the record and concludes that this
27        explanation for the decision to instigate a removal action runs counter to the
          evidence before the EPA.

28

- The Court finds and concludes that the EPA entirely failed to consider the ability of new wells to meet demands for clean drinking water.

- The Court finds and concludes that the EPA entirely failed to consider whether water delivered to Palermo Wellfield customers ever exceeded the MCL.

- The Court finds and concludes that the EPA entirely failed to consider that the City blended water from various wells in the well field before delivering water to customers.

- The Court concludes that the EPA did not offer a satisfactory explanation for its conclusion that there was an imminent risk of contamination of uncontaminated wells.

- The Court finds and concludes that the EPA did not offer a satisfactory explanation for its determination that weather conditions may cause hazardous substances or pollutants or contaminants to migrate or be released.

The Court also concludes that the EPA's characterization of the air strippers as a removal action was improper as a matter of law. In support of this holding, the Court finds and concludes as follows:

- The Court finds and concludes that the conditions at the Site were not time-sensitive and did not pose an imminent or urgent threat.

- The Court concludes that time-sensitivity is the most important factor to be considered in determining whether the EPA's classification of a removal was proper.

- The Court concludes that the interplay between the removal and remedial actions was proper.

- The Court concludes that air stripping is not an example of a removal action listed in 40 C.F.R. §300.415(e).

- The Court concludes that the duration and permanence of the air strippers suggest that the EPA's classification was improper.

The Court concludes that the EPA is entitled to recover an undetermined portion of response costs associated with the Palermo Wellfield Superfund Site removal. The exact amount of such recovery will be determined after further briefing by the parties. In support of this holding, the Court finds and concludes as follows:

- While the Court has determined that the removal action was inconsistent with the National Contingency Plan, the Court is not yet able to determine what portion, if any, of the EPA's response costs associated with the removal is inconsistent with the National Contingency Plan.

- The Court is not yet able to determine whether the EPA's actions would have been significantly changed if the EPA had not committed errors.

- The Court is not yet able to determine what portion of the response costs is associated with the air strippers as a removal action.

The Court will entertain briefing on this issue to determine the exact amount of removal response costs the WSDOT must pay.

The Court concludes that the EPA is entitled to recover all response costs associated with the Palermo Wellfield Superfund Site remedy. The exact amount of such recovery will be determined after further briefing by the parties. In support of this holding, the Court finds and concludes as follows:

- The Court concludes that the EPA's reliance on predictions and modeling to determine that the risk of inhalation of TCE and PCE in air justified a remedial action was not arbitrary and capricious or otherwise not in accordance with law.

- The Court concludes that the WSDOT properly preserved the divisibility affirmative defense by pleading it in the answer and implicitly including it in the Pretrial Order. The Court further concludes that the Pretrial Order was implicitly modified when, at the bench trial, the WSDOT was permitted to offer testimony in support of the divisibility defense and the plaintiff had the opportunity to rebut that evidence or offer evidence in response.

- The Court concludes that there is no reasonable basis for apportioning the harm at the Palermo Wellfield Superfund Site.

- The Court concludes that the WSDOT is jointly and severally liable for the response costs associated with the remedy.

Finally, the Court concludes that the United States is entitled to a declaratory judgment that WSDOT is liable for response costs consistent with the National Contingency Plan to be incurred by the United States in responding to the release of hazardous substances at the Site, pursuant to Section 113(g)(2) of CERCLA, 42 U.S.C. §9613(g)(2).

## V. ORDER

Therefore, it is hereby

**ORDERED** that not later than March 7, 2007, the WSDOT shall file a brief responsive to the Court's findings and conclusions with respect to the costs associated with installation of the air strippers as a removal action. The brief should address which portion of the response costs, if any, the WSDOT may avoid in light of this Opinion. The response, if any, is due March 26, 2007.

1    The reply, if any, is due March 29, 2007. The Court will consider the matter on its March 30,

2    2007, calendar and will enter judgment in favor of the United States for all response costs if the

3    WSDOT fails to make a sufficient showing.

4          The Clerk is directed to enter a declaratory judgment in favor of the United States and

5    against the Washington State Department of Transportation for response costs consistent with the

6    National Contingency Plan to be incurred by the United States in responding to the release of

7    hazardous substances at the Palermo Wellfield Superfund Site, pursuant to Section 113(g)(2) of

8    CERCLA, 42 U.S.C. §9613(g)(2).

9          The Clerk of the Court is instructed to send uncertified copies of this Opinion to all

10   counsel of record via the CM/ECF system and to any party appearing *pro se* at said party's last

11   known address via the U.S. Mail.

12         DATED this 7th day of February, 2007.

13

14

         Robert J. Bryan
15        United States District Judge

16

17

18

19

20

21

22

23

24

25

26

27

28

OPINION
Page 38