1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

UNITED STATES OF AMERICA,

         Plaintiff,

    v.

WASHINGTON STATE DEPARTMENT
OF TRANSPORTATION, and
SOUTHGATE DEVELOPMENT CO.,

         Defendants.

CASE NO. C05-5447RJB

ORDER (1) RE-NOTING
MOTION TO ENTER CONSENT
DECREE AND (2) ON THE
AWARD OF RESPONSE COSTS

This matter comes before the Court on the plaintiff's Motion to Enter Consent Decree Between United States and Defendant Southgate Development Co. (Dkt. 185) and the parties' briefing (Dkts. 191, 195, 196) in response to the Court's Opinion (Dkt. 181). Because the apportionment of response costs is implicated both by the proposed consent decree and by the award of damages, both matters will be addressed by this Order. The Court has considered the pleadings filed in support of and in opposition to the motion, the parties' briefing, and the remainder of the file herein.

## I. FACTUAL BACKGROUND

The Palermo Wellfield Superfund Site ("the Site") is defined by groundwater contaminant plumes in Tumwater, Washington at, and in the vicinity of, the Palermo Wellfield ("PWF") and Palermo neighborhood. The Palermo Wellfield provides drinking water for the City of Tumwater

ORDER
Page 1

1   ("the City"), Washington. The Palermo Wellfield is adjacent to a residential neighborhood in the

2   Palermo Valley, a lowland located in the Deschutes River floodplain. The neighborhood consists

3   of detached, single-family homes bordered on the southeast by the well field, to the northeast by

4   the Tumwater Municipal Golf Course, and to the west by the Palermo Bluff. The Palermo Bluff, a

5   sixty foot rise in elevation from east to west, separates the Palermo Valley (approximately 100

6   feet above sea level) from the Palermo Uplands (approximately 160 feet above sea level). The

7   Palermo Bluff is approximately 800 feet west of the Palermo Wellfield. Continuing west from the

8   Palermo Bluff, the Palermo Uplands encompasses commercial and residential parts of Tumwater.

9   Interstate highway ("I-5") transects the Uplands portion of the Site from southwest to northeast.

10  Groundwater flows generally from the west to the east/northeast.

11      In August of 1993, the City of Tumwater conducted routine drinking water quality testing

12  and discovered trichloroethylene ("TCE") in water from three wells (Wells 2, 4, and 5) at the

13  Palermo Wellfield. The City removed the three contaminated wells from service. The City then

14  installed two new wells, which provided water capacity greater than the capacity of the wells

15  taken out of service. 1048074.[1]

16      To address its water quality concerns, the City sought the Environmental Protection

17  Agency's ("EPA") assistance in September of 1993. The EPA completed a Phase I CERCLA

18  Assessment in March of 1995, a removal assessment at Southgate Dry Cleaners in May of 1995,

19  an Expanded Site Investigation in 1996, and a second removal assessment in March of 1997. The

20  Site was added to the National Priority List on April 7, 1997.

21      On July 3, 1997,[2] the EPA issued an Action Memorandum, authored by the EPA On-

22  Scene Coordinator, selecting removal actions. 1048496. Removal actions were initiated at the

23  Site in March of 1998. One such action was installation of a soil vapor extraction ("SVE") system

24  at the former Southgate Dry Cleaners, the purpose of which was to remove perchloroethylene

25

26      [1] In references to the administrative record, the Court cites the seven-digit document identification numbers of documents in the Certified Remedial Administrative Record and Certified Removal Administrative Record.

27

28      [2] The Action Memorandum is dated June 27, 1997, but was signed with approval on July 3, 1997.

ORDER
Page 2

("PCE") from soil and halt its release to groundwater. The SVE system began operation in 1998 and was decommissioned in June of 2000.

On November 16, 1998, the Regional Administrator for EPA Region 10 signed a Record of Decision ("ROD") documenting the long-term remedial action that the EPA selected for the Site. The selected remedy incorporated the continued operation of the SVE systems. It also selected construction of a subdrain ("french drain") system to  address the risk of inhalation of PCE or TCE vapors emitted from standing groundwater. 1105220-0054-55. On-site construction of the subdrain system began on August 8, 2000, and the system continues to operate.

## II. PROCEDURAL BACKGROUND

The United States brought suit against the Washington State Department of Transportation ("WSDOT")  and Southgate Development Co., Inc. ("Southgate") in federal court, asserting that the defendants are liable under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERCLA"), 42 U.S.C. §§ 9607(a), 9613(g)(2), for "response costs" incurred and to be incurred by the EPA and the U.S. Department of Justice as a result of releases of hazardous substances at the Palermo Wellfield Superfund Site in Tumwater, Washington. The United States seeks a total of $11,188,296.16 from the WSDOT. Dkt. 195 at 15. The United States does not seek costs of the SVE from the WSDOT. Dkt. 165. At 2.

On October 4, 2006, the parties informed the Court that the claims between the plaintiff and Southgate had been resolved. Dkt. 132. The parties were given until December 15, 2006, to file their settlement and dismissal paperwork. Dkt. 161.

A proposed consent decree was filed with the Court on December 14, 2006. Dkt. 163-2. The United States published notice of the proposed consent decree in the Federal Register and accepted public comments for 30 days. Dkt. 185 at 7. Under the terms of the proposed consent decree, Southgate would pay $1,125,000, which represents $518,131.92 spent removing PCE from the Southgate mall property and a share of the costs associated with Site-wide investigation and the french drain remedial action. *Id.* at 2. The plaintiff acknowledges that since execution of

1  the proposed consent decree, the EPA discovered that $156,302.07 was erroneously excluded
2  from the amount of SVE response costs allocated to Southgate. Dkt. 195 at 13-14. The plaintiff
3  has not articulated the effect of this omission on the Southgate settlement.

4    The United States received one comment from the WSDOT, a defendant in this matter.
5  Dkt. 185 at 2. The plaintiff now seeks approval and entry of the proposed consent decree. Dkt.
6  185.

7    On November 15, 2006, the Court granted summary judgment in favor of the plaintiff as
8  to the WSDOT's liability. Dkt. 160. A bench trial was conducted on January 10 and January 12,
9  2007. Dkt. 176, 178. The Court issued a written opinion, ruling that the EPA's decision to
10  conduct a removal was arbitrary and capricious, that the air strippers were improperly
11  characterized as a removal action rather than as a remedy, and that joint and several liability
12  applies. Dkt. 181 at 26, 35. The Court sought further briefing from the parties addressing what
13  portion of the response costs is recoverable. *Id.* at 28. More specifically, the Court sought
14  evidence and argument as to "what portion of the response costs is attributable only to the air
15  stripper as a removal action and not as a remedial action" and as to the amount of response costs
16  for which the WSDOT conceded it was liable. *Id.* at 27. The parties have responded to the
17  Court's request for additional briefing.

18  **III. STATUTORY FRAMEWORK**

19    CERCLA was enacted to facilitate "expeditious and efficient cleanup of hazardous waste
20  sites." *Carson Harbor Village, Ltd. v. Unocal Corp.*, 270 F.3d 863, 880 (9th Cir. 2001). Its
21  secondary purpose is to hold responsible parties accountable for cleanup efforts. *Id.* CERCLA
22  accomplishes these goals by imposing strict liability on owners and operators of facilities where
23  releases of hazardous substances occur. *Id.* at 870. This liability is joint and several, subject to
24  statutory defenses set forth in 42 U.S.C. §9607(b). *See California v. Montrose Chemical Corp. of*
25  *California*, 104 F.3d 1507, 1518 n.9 (9th Cir. 1997).

26    To recover its costs for engaging in response actions, the plaintiff must prove as follows:
27  (1) the site at which the actual or threatened release of hazardous substances occurred constitutes
28

ORDER
Page 4

1   a "facility" under 42 U.S.C. §9601(9); (2) there was a "release" or "threatened release" of a

2   hazardous substance; (3) the party is within one of the four classes of persons subject to liability

3   under 42 U.S.C. §9607(a); and (4) the EPA incurred response costs in responding to the actual or

4   threatened release. *See U.S. v. Chapman*, 146 F.3d 1166, 1169 (9th Cir. 1998); 42 U.S.C.

5   §9607(a)(4)(A).

6          The burden then shifts to the defendant to prove that the government's action in

7   responding was inconsistent with the National Contingency Plan ("NCP"). *Chapman*, 146 F.3d at

8   1169. To prove inconsistency with the NCP, the defendant must demonstrate that the response

9   actions were arbitrary and capricious or otherwise not in accordance with law. *See Washington*

10  *State Dept. of Transp. v. Washington Natural Gas Co.*, 59 F.3d 793, 802 (9th Cir. 1995). If the

11  defendant succeeds in proving that the selection of the response was arbitrary and capricious or

12  otherwise not in accordance with law, the defendant is not necessarily relieved from payment of

13  all response costs. Instead, the government is entitled to recover response costs or damages "not

14  inconsistent with the national contingency plan." 42 U.S.C. §9613(j).

15                              **IV. DISCUSSION**

16  **A. PROPOSED CONSENT DECREE**

17         In deciding whether to approve a CERCLA settlement, the reviewing court's role is to

18  "scrutinize" the settlement, but the EPA is entitled to some deference. *Montrose*, 50 F.3d at 747.

19  When "faced with consent decrees executed in good faith and at arm's length between the EPA

20  and counselled polluters, [district courts] must look at the big picture, leaving interstitial details

21  largely to the agency's informed judgment." *U.S. v. Cannons Engineering Corp.*, 899 F.2d 79, 94

22  (1st Cir. 1990), *cited with approval in Montrose*, 50 F.3d at 746. Courts evaluate settlements on

23  the basis of three, non-mutually exclusive criteria: (1) reasonableness, (2) fairness, and (3)

24  consistency with CERCLA's purposes. *See Montrose*, 50 F.3d at 743; *Cannons Engineering*

25  *Corp.*, 899 F.2d at 90.

26         The proposed consent decree requires Southgate to make a cash payment of $1,095,000

27  to the Palermo Wellfield Special Account, execute a trust agreement establishing the Palermo

28

1    Wellfield Environmental Trust ("the Trust"), provide $30,000 in initial funding for the Trust, and

2    transfer certain insurance claims to the Trust. Dkt. 185-3 at 5-6.

3        **1. Reasonableness**

4        The determination of whether a settlement is reasonable is a "a multifaceted exercise"

5    requiring consideration of several factors: the nature and extent of the hazards at the cleanup site;

6    the degree to which the consent decree will adequately address the hazards present at the site; the

7    possible alternative approaches for remedying the hazards; the extent to which the consent decree

8    furthers the goals of the statutes that form the basis of the litigation; the extent to which the

9    consent decree compensates the public for actual and anticipated response costs; the extent to

10   which the consent decree is in the public's interest; and the relative strengths of the parties'

11   litigating positions. *See U.S. v. Cannons Engineering Corp.*, 720 F. Supp. 1027, 1038 (D.Mass.

12   1989) *aff'd*, *Cannons Engineering Corp.*, 899 F.2d 79; *Cannons Engineering Corp.*, 899 F.2d at

13   89, 90. In this case, the proposed consent decree does not embody the EPA's attempts to address

14   environmental and public health concerns and is primarily "recoupment of cleanup costs already

15   spent." *See Cannons Engineering Corp.*, 899 F.2d at 89. The Court therefore turns its attention

16   to factors relating to the plaintiff's recovery of response costs.

17          **a. Satisfactory Compensation for Actual and Anticipated Response Costs**

18       A settlement should satisfactorily compensate the public for both actual and anticipated

19   costs of remedial and response measures. *Cannons Engineering Corp.*, 899 F.2d at 90.

20   Resolution of this question "can be enormously complex." *Id.*  The EPA need not demonstrate

21   "mathematical precision," and courts defer to the EPA "[i]f the figures relied upon derive in a

22   sensible way from a plausible interpretation of the record." *Id.*

23       In this case, the proposed consent decree embodies response costs for the SVE system,

24   attributable only to Southgate, and response costs to which joint and several liability applies. The

25   plaintiff contends that the proposed consent decree represents compensation for $518,131.92

26   spent on the SVE system. To the extent that the settlement compensates the plaintiff for this

27   amount, the settlement represents satisfactory compensation for actual response costs.

28

1    From the briefing before it, the Court cannot determine whether the remainder of the

2  $1,125,000 is satisfactory compensation for actual or potential response costs. First, the

3  settlement does not compensate the plaintiff for the $156,302.07 recently discovered as omitted

4  from the costs allocated to Southgate. Dkt. 195 at 13. Second, it is unclear which joint and

5  several response costs are covered by the proposed consent decree. The Court should therefore

6  decline to enter the proposed consent decree at this time.

7                    **b. Public Interest**

8    To determine whether a settlement is reasonable, courts may consider the extent to which

9  the settlement is in the public interest. *Cannons Engineering Corp.*, 720 F. Supp. at 1038. The

10  public's interest is in prompt cleanup of hazardous waste sides and requiring responsible parties to

11  bear the costs of remediation. *Id.* at 1047. The settlement requires Southgate, an apparently

12  responsible party, to bear some of the cleanup costs for the Site and does not conflict with the

13  prompt cleanup of hazardous waste sites. The settlement is therefore is consistent with the public

14  interest.

15            **c. Relative Strengths of the Parties' Litigation Positions**

16    In determining the reasonableness of a settlement, courts compare the parties' litigating

17  positions because "the reasonableness of a proposed settlement must take into account

18  foreseeable risks of loss." *Cannons Engineering Corp.*, 899 F.2d at 90. The government is

19  expected to "drive a harder bargain" if it has a strong case. *Id.* The Court cannot yet determine

20  whether the settlement comports with the apparent strength of the parties' litigating positions. It

21  is unclear which joint and several response costs the settlement covers, and the Court therefore

22  cannot evaluate whether the government reached a reasonable bargain with respect to Southgate.

23    **2. Fairness**

24    Fairness has procedural and substantive components. *Montrose*, 50 F.3d at 746 ("(1) the

25  product of a procedurally fair process, and (2) substantively fair to the parties in light of a

26  reasonable reading of the facts"). Courts should evaluate the fairness of a consent decree from the

27  standpoint of non-settling defendants, but the effect on such defendants is not determinative.

28

1    *Cannons Engineering Corp.*, 720 F. Supp. at 1040.

2                              **a. Procedural Fairness**

3           To determine whether the settlement process was procedurally fair, the court asks whether

4    the negotiation process was one of "candor, openness, and bargaining balance." *See Cannons*

5    *Engineering Corp.*, 899 F.2d at 86. Factors to be considered include whether the settlements

6    were reached at arm's length, whether experienced counsel participated in the negotiations,

7    whether non-settling defendants were afforded an opportunity to participate, and whether the

8    agency operated in good faith. *See id.* at 87. In this case, both the settling and non-settling

9    defendant were involved in a Settlement Conference before Magistrate Judge Arnold. Dkt. 132.

10   The WSDOT does not contend that these proceedings lacked procedural fairness, and the Court

11   finds no other basis upon which to conclude that the parties' settlement lacked procedural

12   fairness. *See* Dkt. 190 (WSDOT's Opposition); Dkt. 185-2 (the WSDOT's comment on the

13   proposed consent decree).

14                             **b. Substantive Fairness**

15          With regard to substantive fairness, "settlement terms must be based upon, and roughly

16   correlated with, some acceptable measure of comparative fault, apportioning liability among the

17   settling parties according to rational (if necessarily imprecise) estimates of how much harm each

18   PRP has done." *Cannons Engineering Corp.*, 899 F.2d at 87. There is no universal method for

19   measuring comparative fault, and the appropriate measure depends upon the factual

20   circumstances. *See id.* Courts should uphold the EPA's formula for measuring comparative fault

21   and allocating liability if " the agency supplies a plausible explanation for it, welding some

22   reasonable linkage between the factors it includes in its formula or scheme and the proportionate

23   shares of the settling PRPs." *Id.* The reviewing court must afford deference to an agency's

24   settlement, but the true measure of that deference depends upon the persuasiveness of the

25   agency's proposal and rationale. *Montrose*, 50 F.3d at 746. In other words, the agency's

26   allocation of fault should be upheld unless it is "arbitrary, capricious, and devoid of a rational

27   basis." *Cannons Engineering Corp.*, 899 F.2d at 87.

28

1       One method of assessing comparative fault is to determine the proportional relationship

2   between (1) the amount of money to be paid by the settling defendant and (2) the government's

3   estimate of total potential damages. *Montrose*, 50 F.3d at 747. Courts may consider the ability of

4   the government to collect from non-settling defendants and may include reasonable and justified

5   discounts, such as for litigation risks and time savings. *Id.*

6       The Motion to Enter Consent Decree (Dkt. 185) offers no method of assessing the

7   comparative fault of Southgate and the WSDOT, contending only that the WSDOT is more

8   culpable than Southgate and that Southgate's assets are limited. Dkt. 185 at 14. The United

9   States contends that "no basis for a mathematical allocation formula exists." Dkt. 193 at 4. The

10  plaintiff contends that it cannot offer a formula or scheme because "the quantities of solvent

11  released to the environment by WSDOT and Southgate remain unknown" and because

12  "[e]vidence as to relative harm caused by the defendants does not exist." Dkt. 193 at 4.

13      It appears that the consent degree is based, in large part, on Southgate's ability to pay. For

14  example, the plaintiff contends that "Southgate is a small company with limited income and

15  assets" with its primary assets being insurance policies and the Southgate shopping center. Dkt.

16  185 at 14-15. From the plaintiff's general description of Southgate's assets, the Court cannot

17  determine to what degree Southgate's ability to pay influenced the proposed consent decree.

18      The Court appreciates the irony of the plaintiff's position. At trial, the plaintiff was forced

19  to defend against the WSDOT's assertion of the divisibility defense by contending that the harm

20  addressed by the french drain was not divisible. *See, e.g.*, Dkt. 166 at 32. In seeking approval of a

21  settlement involving only one potentially responsible party, the plaintiff is in the position of

22  demonstrating that the harms at the Site may indeed be fairly divided and apportioned, at least in

23  part.

24      The parties do not dispute that Southgate alone is responsible for the $518,131.92 spent

25  to remove PCE from the Southgate mall property. Dkt. 185 at 2; Dkt. 190 at 3. The plaintiff

26  contends that the remaining amount is "a reasonable share of the costs of site-wide investigation

27  and the French Drain remedial action." Dkt. 185 at 2. The plaintiff offers no formula or scheme

28

1   upon which the Court may conclude this amount reasonably represents Southgate's share of Site-

2   wide costs. The plaintiff does not present the Court with figures representing "the costs of site-

3   wide investigation and the French Drain remedial action." In addition, it appears that the

4   settlement omits $156,302.07 in soil vapor extraction costs that were inadvertently overlooked in

5   segregating the costs of the SVE system. *See* Dkt. 195 at 13-14. The Court is therefore unable to

6   determine to what extent Southgate is being held responsible for Site-wide costs or whether that

7   amount of responsibility is reasonable.

8        By allocating the costs of the soil vapor extraction system, the plaintiff implicitly advances

9   an alternative theory for allocation of response costs: the identity of the expenditure. At a

10  minimum, the plaintiff should identify the response costs covered by the amount that Southgate

11  has agreed to pay. This has direct bearing upon questions posed by the parties' supplemental

12  briefing on damages, including to what degree the WSDOT should be responsible for costs

13  relating to the Brewery City Pizza Report. *See* Dkt. 191 at 13 ("EPA has already segregated out a

14  portion of these costs as allocable to Southgate. WSDOT contends that it should not be liable for

15  the $566,012 contained in this cost summary.").

16       In addition, the plaintiff should explain the effect of any recovery on "the Non-Ace/Aetna

17  Policies." According to the proposed consent decree, there may be liability insurance policies

18  issued to or for the benefit of Southgate or a predecessor in interest, and such policies "if located,

19  may provide coverage for all or part of the claims the United States is making against

20  [Southgate]." Dkt. 185-3 at 2.

21       The effect of recovery on these policies is unclear from the proposed consent decree. The

22  motion contends, without citing to the proposed consent decree, that "[a]ny recovery under those

23  [insurance] policies will inure to WSDOT's benefit by reducing the amount of future costs for

24  which WSDOT is otherwise liable." Dkt. 193 at 10. While the proposed consent decree's figures

25  may indeed be based upon a rational formula or scheme, the plaintiff simply has not submitted that

26  formula or scheme to the Court for review. On the basis of the information before it, the Court

27  should decline to now enter the proposed consent decree.

28

ORDER
Page 10

### 3. Consistency with CERCLA

The two major policy concerns underlying CERCLA are the desire to equip the federal government with the tools necessary to promptly and effectively respond to problems resulting from hazardous waste disposal and to require parties responsible for those problems to bear the costs of remedying the harm. *Cannons Engineering Corp.*, 899 F.2d at 90-91. CERCLA's overarching principles are accountability, the desirability of an unsullied environment, and promptness of response activities. *Id.* at 91.

It is unclear to what degree the proposed consent decree seeks to hold Southgate liable as compared to the overall harm at the Site. Moreover, it is not clear from the parties' briefing whether any response costs covered by the proposed consent decree resulted from actions deemed arbitrary and capricious or otherwise not in accordance with law. The Court is therefore not yet in a position to determine whether the proposed consent decree is consistent with CERCLA.

### 4. Other Concerns

The Court had an opportunity to discuss the proposed consent decree with counsel for the United States and for WSDOT before the Motion to Enter Consent Decree was ripe for decision. At that time, the Court noted that the Trust Agreement referenced Exhibit 1 but contained no such exhibit. *See* Dkt. 163-3 at 11. The plaintiff remedied this omission. Dkt. 175-2. The Court also inquired as to the qualifications and experience of the named trustee, Daniel J. Silver. The motion does not address this concern. The Court also notes that the proposed consent decree erroneously lists the cause number in this case as 06-5447-JRB or 06-5447-RJB. Dkt. 185-3 at 6, 7, 14, 16.

The WSDOT's opposition to entry of the proposed consent decree notes that there are "no requirements placed on the trustee to ensure his performance." Dkt. 190 at 9. The position of trustee carries with it certain fiduciary performance obligations that, perhaps, need not be spelled out in detail in the Trust Agreement. The effectiveness of such obligations in shaping the trustee's performance may be undermined by the Trust Agreement in this case, which limits the trustee's

1  liability to gross negligence or willful misconduct. Dkt. 185-4 at 15. If the parties decide to

2  modify the proposed consent decree, it is hoped that they will consider these concerns.

3  **B. AWARD OF RESPONSE COSTS**

4        Following a bench trial, the Court issued an Opinion in which it held that the removal

5  action, installation of the air strippers, was inconsistent with the National Contingency Plan. Dkt.

6  181 at 22. The Court also held that the selection of the french drain as part of the remedial action

7  was not arbitrary and capricious and that the harm addressed by the french drain was not divisible.

8  *Id.* at 29, 35. Having concluded that the EPA was arbitrary and capricious only as to the removal

9  action, the Court was tasked with determining what portion of response costs were recoverable.

10 Because the WSDOT had not identified which response costs were associated with the removal

11 and should be disallowed, the Court ordered more briefing on the issue of damages. *Id.* at 27, 36-

12 37.

13       The Court also noted the possibility that the WSDOT would encounter difficulty in

14 identifying response costs associated only with the air strippers as a removal action because the

15 remedial action included continuation of the air strippers:

16     This case presents a somewhat unique question because it involves a disputed removal that
   was also implemented as a remedy. As presented to the Court, the record does not
17     support a finding that the air stripper portion of the *remedial* action was improper or
   would not have occurred if not for the EPA's installation of air strippers as part of the
18     removal. In this sense, this case is distinguishable from *Washington State Dept. of Transp.*,
   59 F.3d 793, in which the court denied recovery of all response costs for failure to comply
19     with the NCP. Here, the EPA did comply with the NCP only with respect to the *continued
   operation* of the air strippers as a *remedial* action. The WSDOT is therefore in the
20     difficult position of having to demonstrate what portion of the response costs is
   attributable only to the air stripper as a removal action and not as a remedial action. In
21     other words, the WSDOT is charged with proving what harm it suffered as a result of the
   installation of the air stripper as a removal action when the installation of the air stripper as
22     a remedy was proper. The WSDOT has not demonstrated which portion of the air stripper
   costs, if any, is attributable to only the removal.
23
   The WSDOT apparently attempts to avoid contesting particular response costs by
24     contending that the air stripper would have been deemed unnecessary as a remedy if the
   SVE system had been allowed to operate first to remove contaminants from the soil. Dkt.
25     154-1 at 7, 167-1 at 8. At trial, Michael Riley testified that the plume may have dissipated
   on its own as a result of the SVE. This speculation is not a sufficient basis for disallowing
26     all costs of the air stripper because it is simply impossible to know whether the air stripper
   would eventually have been installed as a proper remedial action without evidence that the
27     EPA's selection of the air stripper as a *remedy* was itself improper or that the SVE would
   have completely eliminated any need for the air stripper. The Court is therefore unable to

28

determine what portion of the response costs the United States may recover. The parties should be afforded an opportunity to provide briefing as to what portion of the response costs is recoverable in light of the Court's determination that selection of the air strippers as a removal action was arbitrary and capricious and that characterization of the air strippers as a removal was improper.

*Id.* at 27-28. The Court ordered the WSDOT to file a brief addressing which portion of the response costs the WSDOT may avoid in light of the Court's Opinion. *Id.* at 37. In its briefing, the WSDOT contends that the plaintiff should be barred from recovery of three types of response costs: (1) costs associated with installation and design of the air strippers, the removal action; (2) costs associated with the SVE system, for which Southgate is responsible; and (3) costs associated with the Brewery City Pizza Report.

### 1. Air Strippers as Removal

The WSDOT contends that the United States cannot recover costs associated with installation of the air strippers. In its Opinion, the Court characterized the WSDOT's burden as "proving what harm it suffered as a result of the *installation* of the air stripper as a removal action when the *installation* of the air stripper as a remedy was proper." Dkt. 181 at 27. The Court then concluded that the WSDOT failed to "demonstrate[] which portion of the air stripper costs, if any, is attributable to only the removal." *Id.*

As a technical matter, the air strippers were only installed at the Site as part of the removal action. The remedial action called for continued operation of the air strippers that had already been constructed. 1105220-0125. The WSDOT did not contest the EPA's continued operation of the air strippers as a remedial action because the costs associated with this aspect of the remedy and sought by the plaintiff are "minimal." Dkt. 191. Furthermore, the City of Tumwater later assumed these operation costs at its own expense. *See* 1101314; Dkt. 195-2 at 3.

In its supplemental briefing, the WSDOT was charged with identifying which response costs are inconsistent with the NCP and therefore not recoverable. Dkt. 181 at 37. To do so, the WSDOT identifies the costs of designing and installing the air strippers as a removal action, a removal action that the Court has determined was arbitrary and capricious or otherwise not in accordance with law. The WSDOT offers the declaration of Paul Pederson, who was retained by

1    the WSDOT to determine, from the plaintiff's cost summaries, which costs are not allocable to

2    the WSDOT. Dkt. 192 at 1. Mr. Pederson has determined that $5,911,123 of the costs the

3    plaintiff seeks to recover are attributable to the design and installation of the air strippers as a

4    removal action. Dkt. 191 at 12-13; Dkt. 195-2 (the plaintiff's figure is $5,330,736.41).

5          To rebut this evidence, the plaintiff contends that costs associated with installation and

6    design of the air strippers would have been incurred as a remedial action if the EPA had not been

7    arbitrary and capricious in installing the air strippers as a removal action. Dkt. 195 at 7. In other

8    words, the plaintiff contends that "no excess costs were incurred by EPA installing the air

9    strippers early." Dkt. 195 at 4. The plaintiff contends that the only less expensive alternative to

10   continued operation of the air strippers was no action, an alternative that the EPA never would

11   have selected as a remedy. *Id.*

12         The plaintiff fails to demonstrate that the EPA would have incurred the same amount of

13   response costs by installing the air strippers as a remedy if not for the arbitrary and capricious

14   removal because the EPA's Record of Decision did not consider whether installation of the air

15   strippers as a remedial action would be proper. Instead, the Record of Decision incorporated use

16   of the existing air strippers. *See* 1105220-0069-0078. There was no need to scrutinize installation

17   of the air strippers as a potential remedial action because the air strippers had already been

18   improperly installed as an improper removal. Thus, the Court simply cannot conclude that the

19   EPA would be entitled to recover costs for design and installation of the air strippers as a

20   remedial action if the air strippers had not be installed as a removal.

21         The Court's conclusion that the plaintiff is not entitled to recovery of response costs

22   associated with the design and installation of the air strippers does not end the inquiry, however.

23   The parties disagree as to the amount of response costs associated with installation and design of

24   the air strippers. The plaintiff contends that the total cost for design and construction of the air

25   strippers was $5,330,736.41. Dkt. 195-2. The WSDOT contends that the cost associated with

26   design and installation of the air strippers is $5,911,123. Dkt. 191 at 12-13. The basis for this

27   discrepancy is unclear.

28

**2. SVE Costs**

The WSDOT's accountant recommends exclusion of $545,289 in costs allegedly attributable to the SVE system. Dkt. 191 at 11. This figure exceeds the $518,131.92 for which both parties agree Southgate is responsible. *See* Dkt. 185 at 2; Dkt. 190 at 3. The basis for this discrepancy is unclear. In addition, it appears that these figures do not account for the $156,302.07 that the EPA "inadvertently overlooked" when allocating costs of the SVE system. *See* Dkt. 195 at 13-14. The plaintiff agrees that this figure must be deducted from the damages paid by the WSDOT. *See id.* at 15.

**3. Brewery City Pizza Report**

The WSDOT also seeks exclusion of $566,012 associated with the Brewery City Pizza Report and contends that the plaintiff has already allocated some of these costs to Southgate. Dkt. 191 at 13. The WSDOT does not contend that these costs are associated with the soil vapor extraction system or are attributable to the installation and design of the air strippers. *See id.* It appears that excluding these costs would therefore be inconsistent with the Court's holding that joint and several liability applies. The Court should not exclude these costs.

**4. Effect of the Consent Decree**

As noted above, a proposed consent decree between Southgate and the United States is currently pending before the Court. The proposed consent decree contemplates Southgate's payment for the SVE system as well as a "share of the costs of site-wide investigation and the French Drain remedial action." Dkt. 185 at 2. It is unclear whether this share has been deducted from the WSDOT's share of the Site-wide costs.

**5. Evidentiary Hearing**

The plaintiff objects to the declaration of Paul Pederson because the plaintiff has not been afforded an opportunity to depose or cross examine this witness. Dkt. 195 at 12. Without such an opportunity, the plaintiff alleges that it is difficult to determine whether costs were properly excluded. Dkt. 195 at 12. It appears, however, that such testimony may assist the Court in deciphering the cost summaries and determining which costs are attributable to the air strippers as

1  a removal action.

2      The WSDOT appears confident that the parties may reach agreement as to the discrepancy

3  of their figures. Dkt. 196 at 8. Such an agreement would eliminate the need for testimony and

4  further briefing on this issue. If the parties are unable to reach agreement, the Court should hold

5  an evidentiary hearing, at which the parties could present limited testimony regarding the

6  allocation of response costs associated with the SVE system and with the air strippers as a

7  removal action. The Court should afford the parties an opportunity to stipulate to the cost

8  discrepancies before scheduling an evidentiary hearing.

9  **C. CONCLUSION**

10     From the parties' briefing, the Court is not yet able to determine whether the proposed

11 consent decree is reasonable, fair, and consistent with CERCLA and therefore should decline to

12 enter the proposed consent decree at this juncture. The Court should afford the parties an

13 opportunity to provide briefing on the proposed consent decree as follows:

14      •   Whether the proposed consent decree encompasses the $156,302.07 that
            was "inadvertently overlooked" when allocating response costs to
15          Southgate;

16      •   Whether the proposed consent decree includes response costs for which
            the WSDOT is jointly and severally liable and the amount of such response
17          costs;

18      •   With specificity, which response costs are covered by the proposed consent
            decree;
19

20      •   Southgate's financial ability to pay for its portion of the harm and the
            degree to which that ability affects the proposed consent decree;

21      •   The plaintiff's allocation of costs associated with the Brewery City Pizza
            Report to Southgate and the effect of such allocation on the WSDOT's
22          responsibility;

23      •   The effect of any recovery from "the Non-Ace/Aetna Policies";

24      •   Whether any response costs covered by the proposed consent decree
            represent costs of the removal action, which was deemed arbitrary and
25          capricious or otherwise not in accordance with law; and

26      •   The degree to which the proposed consent decree and accompanying
            documents secure the trustee's best efforts in pursuing recovery on "the
27          Non-Ace/Aetna Policies."

28

ORDER
Page 16

1    These questions will likely affect the Court's ruling on damages. It is not yet clear what

2  effect entry of the proposed consent decree would have on the WSDOT's payment of response

3  costs. While the WSDOT is not required to pay response costs associated with an arbitrary and

4  capricious removal, the parties' disagreement as to the amount of such response costs precludes

5  an award of response costs at this time. The parties should be afforded an opportunity to resolve

6  the discrepancies between their figures, hopefully avoiding the time and expense of an evidentiary

7  hearing.

8                                          **V. ORDER**

9    Therefore, it is hereby

10    **ORDERED** that the plaintiff's Motion to Enter Consent Decree Between United States

11  and Defendant Southgate Development Co. (Dkt. 185) is **RE-NOTED** for consideration on May

12  25, 2007. Not later than May 9, 2007, the plaintiff shall file a brief responsive to the issues

13  identified herein. The WSDOT's response, if any, is due May 21, 2007. The reply, if any, is due

14  May 24, 2007. It is further

15    **ORDERED** that, on or before May 25, 2007, the parties shall advise the Court as to their

16  ability to reach agreement on the categories of response costs addressed above.

17    The Clerk of the Court is instructed to send uncertified copies of this Order to all counsel

18  of record and to any party appearing pro se at said party's last known address.

19    DATED this 25th  day of April, 2007.

20

21

22                                   ROBERT J. BRYAN
                                     United States District Judge

23

24

25

26

27

28

ORDER
Page 17