UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

UNITED STATES OF AMERICA,

                Plaintiff,

   v.

WASHINGTON STATE DEPARTMENT
OF TRANSPORTATION, and
SOUTHGATE DEVELOPMENT CO.,

                Defendants.

CASE NO. C05-5447RJB

ORDER APPROVING CONSENT
DECREE AND AWARDING
RESPONSE COSTS

This matter comes before the Court on the plaintiff's Motion to Enter Consent Decree Between United States and Defendant Southgate Development Co. (Dkt. 185), supplemental briefing thereon (Dkt. 203, 211), and the parties' Stipulation Regarding Air Stripper Costs (Dkt. 210). The Court has considered the pleadings filed in support of and in opposition to the motion, the parties' briefing, and the remainder of the file herein.

## I. FACTUAL BACKGROUND

The Palermo Wellfield Superfund Site ("the Site") is defined by groundwater contaminant plumes in Tumwater, Washington at, and in the vicinity of, the Palermo Wellfield ("PWF") and Palermo neighborhood. The Palermo Wellfield provides drinking water for the City of Tumwater ("the City"), Washington. The Palermo Wellfield is adjacent to a residential neighborhood in the Palermo Valley, a lowland located in the Deschutes River floodplain. The neighborhood consists

1   of detached, single-family homes bordered on the southeast by the well field, to the northeast by

2   the Tumwater Municipal Golf Course, and to the west by the Palermo Bluff. The Palermo Bluff, a

3   sixty foot rise in elevation from east to west, separates the Palermo Valley (approximately 100

4   feet above sea level) from the Palermo Uplands (approximately 160 feet above sea level). The

5   Palermo Bluff is approximately 800 feet west of the Palermo Wellfield. Continuing west from the

6   Palermo Bluff, the Palermo Uplands encompasses commercial and residential parts of Tumwater.

7   Interstate highway ("I-5") transects the Uplands portion of the Site from southwest to northeast.

8   Groundwater flows generally from the west to the east/northeast.

9       In August of 1993, the City of Tumwater conducted routine drinking water quality testing

10  and discovered trichloroethylene ("TCE") in water from three wells (Wells 2, 4, and 5) at the

11  Palermo Wellfield. The Palermo Wellfield provides drinking water for 5,600 residents of the City

12  of Tumwater. In one of the wells tested, the TCE level was over the drinking water standard

13  maximum contaminant level ("MCL") of 5 parts per billion ("ppb"). The water was retested over

14  the next several days, and the results were confirmed. The parties do not dispute that this

15  contamination was attributable, in part, to a Washington State Department of Transportation

16  ("WSDOT") testing laboratory operated during the late 1960s and early 1970s and, possibly, to a

17  currently operated WSDOT materials testing lab. Other possible sources for the contamination,

18  including the Southgate Dry Cleaners and the Brewery City Pizza location, have also been

19  identified. The parties agree that TCE at the Site is attributable, in part, to biodegradation of

20  perchloroethylene ("PCE") to TCE. There is no evidence in the record, and the parties did not

21  offer evidence or testimony at trial, demonstrating the rate or extent of such biodegradation.

22      The City removed the three contaminated wells from service. The City then installed two

23  new wells, which provided water capacity greater than the capacity of the wells taken out of

24  service. 1048074.[1]

25

26      [1] In references to the administrative record, the Court cites the seven-digit document identification
    numbers of documents in the Certified Remedial Administrative Record and Certified Removal Administrative
27  Record. Except as indicated, the Court has considered only documents in the Certified Removal Administrative
    Record when evaluating the removal action and only documents in the Certified Remedial Administrative record
28  when evaluating the remedial action.

ORDER
Page 2

1   To address its water quality concerns, the City sought the Environmental Protection

2   Agency's ("EPA") assistance in September of 1993. The EPA completed a Phase I CERCLA

3   Assessment in March of 1995, a removal assessment at Southgate Dry Cleaners in May of 1995,

4   an Expanded Site Investigation in 1996, and a second removal assessment in March of 1997. The

5   Site was added to the National Priority List on April 7, 1997.

6   On July 3, 1997,[2] the EPA issued an Action Memorandum, authored by the EPA On-

7   Scene Coordinator, selecting removal actions. 1048496. Later action memoranda approved a

8   ceiling increase and an exemption of the two million dollar limit for removal actions and an

9   exemption of the twelve month limit for removal actions. 1048789, 1105726. Removal actions

10  were initiated at the Site in March of 1998. One such action was installation of a soil vapor

11  extraction ("SVE") system at the former Southgate Dry Cleaners, the purpose of which was to

12  remove PCE from soil and halt its release to groundwater. The SVE system began operation in

13  1998 and was decommissioned in June of 2000. The second component of the removal was the

14  EPA's installation of two air strippers at the Palermo Wellfield. An air stripper transfers

15  contaminants from water to air by blowing air upward as water flows downward. 1224288-0021.

16  The air is then treated before being discharged. *Id.* Construction of the air stripping system was

17  completed in February of 1999.

18  On November 16, 1998, the Regional Administrator for EPA Region 10 signed a Record

19  of Decision ("ROD") documenting the long-term remedial action that the EPA selected for the

20  Site. The selected remedy incorporated the continued operation of the wellhead treatment and

21  SVE systems. It also selected construction of a subdrain ("french drain") system to collect

22  groundwater containing TCE and PCE surfacing in the area of residences at the base of the

23  Palermo Bluff. On-site construction of the subdrain system began on August 8, 2000, and the

24  system continues to operate.

25  ## II. PROCEDURAL BACKGROUND

26  The United States brought suit against the Washington State Department of

27

28  ---
    [2] The Action Memorandum is dated June 27, 1997, but was signed with approval on July 3, 1997.

ORDER
Page 3

1   Transportation ("WSDOT")  and Southgate Development Co., Inc. ("Southgate") in federal

2   court, asserting that the defendants are liable under the Comprehensive Environmental Response,

3   Compensation, and Liability Act of 1980, as amended ("CERCLA"), 42 U.S.C. §§ 9607(a),

4   9613(g)(2), for "response costs" incurred and to be incurred by the EPA and the U.S. Department

5   of Justice as a result of releases of hazardous substances at the Palermo Wellfield Superfund Site

6   in Tumwater, Washington. The United States seeks a total of $11,188,296.16 from the WSDOT.

7   Dkt. 195 at 15. The United States does not seek costs of the SVE from the WSDOT. Dkt. 165 at

8   2.

9        On October 4, 2006, the parties informed the Court that the claims between the plaintiff

10  and Southgate had been resolved. Dkt. 132. The parties were given until December 15, 2006, to

11  file their settlement and dismissal paperwork. Dkt. 161.

12       A proposed consent decree was filed with the Court on December 14, 2006. Dkt. 163-2.

13  The United States published notice of the proposed consent decree in the Federal Register and

14  accepted public comments for 30 days. Dkt. 185 at 7. Under the terms of the proposed consent

15  decree, Southgate would pay $1,125,000, which represents $518,131.92 spent removing PCE

16  from the Southgate mall property and a share of the costs associated with Site-wide investigation

17  and the french drain remedial action. *Id.* at 2. The plaintiff acknowledges that since execution of

18  the proposed consent decree, the EPA discovered that $156,302.07 was erroneously excluded

19  from the amount of SVE response costs allocated to Southgate. Dkt. 195 at 13-14.

20       The United States received one comment from the WSDOT, a defendant in this matter.

21  Dkt. 185 at 2. The plaintiff sought approval and entry of the proposed consent decree. Dkt. 185.

22  From the briefing before it, the Court was unable to determine whether the proposed consent

23  decree represents adequate compensation for response costs, whether the plaintiff reached a

24  reasonable bargain with respect to Southgate, whether the proposed consent decree's allocation

25  of costs is substantively reasonable, and whether the proposed consent decree is consistent with

26  CERCLA. Dkt. 200 at 7, 10, 11. The Court therefore re-noted the Motion to Enter Consent

27  Decree. *Id.* at 17.

28       On November 15, 2006, the Court granted summary judgment in favor of the plaintiff as

ORDER
Page 4

1   to the WSDOT's liability. Dkt. 160. A bench trial was conducted on January 10 and January 12,

2   2007. Dkt. 176, 178. The Court issued a written opinion, ruling that the EPA's decision to

3   conduct a removal was arbitrary and capricious, that the air strippers were improperly

4   characterized as a removal action rather than as a remedy, and that joint and several liability

5   applies. Dkt. 181 at 26, 35. The Court sought further briefing from the parties addressing what

6   portion of the response costs is recoverable. *Id.* at 28.

7        The parties provided such briefing, and the Court held the plaintiff is not entitled to

8   recovery of response costs associated with the design and installation of the air strippers. Dkt. 200

9   at 14. Because there were discrepancies in the parties' characterization of response costs, the

10   Court noted that such discrepancies could be resolved in an evidentiary hearing or by the

11   stipulation of the parties. *Id.* at 16. The Court afforded an opportunity for the parties to attempt

12   to reach agreement as to the costs associated with air strippers. The parties have reached

13   agreement and filed a stipulation listing $5,646,676 as the amount of response costs incurred for

14   the design and installation of the air strippers. Dkt. 210.

15        Having received supplemental briefing from both parties, the entry of the consent decree

16   and allocation of response costs are issues ripe for consideration.

17                             **III. CERCLA**

18        CERCLA was enacted to facilitate "expeditious and efficient cleanup of hazardous waste

19   sites." *Carson Harbor Village, Ltd. v. Unocal Corp.*, 270 F.3d 863, 880 (9th Cir. 2001). Its

20   secondary purpose is to hold responsible parties accountable for cleanup efforts. *Id.* CERCLA

21   accomplishes these goals by imposing strict liability on owners and operators of facilities where

22   releases of hazardous substances occur. *Id.* at 870. This liability is joint and several, subject to

23   statutory defenses set forth in 42 U.S.C. §9607(b). *See California v. Montrose Chemical Corp. of*

24   *California*, 104 F.3d 1507, 1518 n.9 (9th Cir. 1997).

25        To recover its costs for engaging in response actions, the plaintiff must prove as follows:

26   (1) the site at which the actual or threatened release of hazardous substances occurred constitutes

27   a "facility" under 42 U.S.C. §9601(9); (2) there was a "release" or "threatened release" of a

28   hazardous substance; (3) the party is within one of the four classes of persons subject to liability

1    under 42 U.S.C. §9607(a); and (4) the EPA incurred response costs in responding to the actual or

2    threatened release. *See U.S. v. Chapman*, 146 F.3d 1166, 1169 (9th Cir. 1998); 42 U.S.C.

3    §9607(a)(4)(A).

4          The burden then shifts to the defendant to prove that the government's action in

5    responding was inconsistent with the National Contingency Plan ("NCP"). *Chapman*, 146 F.3d at

6    1169. To prove inconsistency with the NCP, the defendant must demonstrate that the response

7    actions were arbitrary and capricious or otherwise not in accordance with law. *See Washington*

8    *State Dept. of Transp. v. Washington Natural Gas Co.*, 59 F.3d 793, 802 (9th Cir. 1995). If the

9    defendant succeeds in proving that the selection of the response was arbitrary and capricious or

10   otherwise not in accordance with law, the defendant is not necessarily relieved from payment of

11   all response costs. Instead, the government is entitled to recover response costs or damages "not

12   inconsistent with the national contingency plan." 42 U.S.C. §9613(j).

13                                    **IV. DISCUSSION**

14   **A. PROPOSED CONSENT DECREE**

15         In deciding whether to approve a CERCLA settlement, the reviewing court's role is to

16   "scrutinize" the settlement, but the EPA is entitled to some deference. *Montrose*, 50 F.3d at 747.

17   When "faced with consent decrees executed in good faith and at arm's length between the EPA

18   and counselled polluters, [district courts] must look at the big picture, leaving interstitial details

19   largely to the agency's informed judgment." *U.S. v. Cannons Engineering Corp.*, 899 F.2d 79, 94

20   (1st Cir. 1990), *cited with approval in Montrose*, 50 F.3d at 746. Courts evaluate settlements on

21   the basis of three, non-mutually exclusive criteria: (1) reasonableness, (2) fairness, and (3)

22   consistency with CERCLA's purposes. *See Montrose*, 50 F.3d at 743; *Cannons Engineering*

23   *Corp.*, 899 F.2d at 90.

24         **1. Reasonableness**

25         The determination of whether a settlement is reasonable is a "a multifaceted exercise"

26   requiring consideration of several factors: the nature and extent of the hazards at the cleanup site;

27   the degree to which the consent decree will adequately address the hazards present at the site; the

28   possible alternative approaches for remedying the hazards; the extent to which the consent decree

ORDER
Page 6

1   furthers the goals of the statutes that form the basis of the litigation; the extent to which the

2   consent decree compensates the public for actual and anticipated response costs; the extent to

3   which the consent decree is in the public's interest; and the relative strengths of the parties'

4   litigating positions. *See U.S. v. Cannons Engineering Corp.*, 720 F. Supp. 1027, 1038 (D.Mass.

5   1989) *aff'd*, *Cannons Engineering Corp.*, 899 F.2d 79; *Cannons Engineering Corp.*, 899 F.2d at

6   89, 90. In this case, the proposed consent decree does not embody the EPA's attempts to address

7   environmental and public health concerns and is primarily "recoupment of cleanup costs already

8   spent." *See Cannons Engineering Corp.*, 899 F.2d at 89. The Court therefore turns its attention

9   to factors relating to the plaintiff's recovery of response costs.

10              **a. Satisfactory Compensation for Actual and Anticipated Response Costs**

11          A settlement should satisfactorily compensate the public for both actual and anticipated

12   costs of remedial and response measures. *Cannons Engineering Corp.*, 899 F.2d at 90.

13   Resolution of this question "can be enormously complex." *Id.* The EPA need not demonstrate

14   "mathematical precision," and courts defer to the EPA "[i]f the figures relied upon derive in a

15   sensible way from a plausible interpretation of the record." *Id.*

16          In this case, the proposed consent decree embodies response costs for the SVE system,

17   attributable only to Southgate, and response costs to which joint and several liability applies. The

18   plaintiff contends that the proposed consent decree represents compensation for $674,433.99

19   spent on the SVE system. Dkt. 203 at 3. To the extent that the settlement compensates the

20   plaintiff for this amount, the settlement represents satisfactory compensation for actual response

21   costs.

22          The Court has previously expressed reluctance to enter the consent decree because it was

23   unclear that the settlement compensated the plaintiff for the $156,302.07 recently discovered as

24   omitted from the costs allocated to Southgate and because it was unclear which joint and several

25   response costs are covered by the proposed consent decree. Dkt. 200 at 7.

26          The plaintiff now contends that the consent decree does encompass the $156,302.07

27   erroneously omitted from the costs allocated to Southgate. Dkt. 203 at 2. The Court notes that

28   the consent decree was not modified after the plaintiff discovered that $156,302.07 had been

ORDER
Page 7

1   overlooked when calculating the costs of the SVE system. According to the plaintiff, the consent

2   decree also encompasses joint and several costs including the Expanded Site Investigation,

3   Brewery City Pizza Removal Assessment, Remedial Investigation and Feasibility Study, and other

4   cleanup costs. Dkt. 203 at 3-4. While the proposed consent decree may not compensate the public

5   with mathematical precision, the Court is persuaded that the entry of the proposed consent decree

6   would satisfactorily compensate the public.

7                          **b. Public Interest**

8          To determine whether a settlement is reasonable, courts may consider the extent to which

9   the settlement is in the public interest. *Cannons Engineering Corp.*, 720 F. Supp. at 1038. The

10  Court has previously held that the settlement is consistent with the public interest. Dkt. 200 at 7.

11                 **c. Relative Strengths of the Parties' Litigation Positions**

12         In determining the reasonableness of a settlement, courts compare the parties' litigating

13  positions because "the reasonableness of a proposed settlement must take into account

14  foreseeable risks of loss." *Cannons Engineering Corp.*, 899 F.2d at 90. The government is

15  expected to "drive a harder bargain" if it has a strong case. *Id.*

16         In its supplemental briefing, the plaintiff contends that its settlement negotiation with

17  Southgate was based on the concern that Southgate might succeed in limiting its liability to only

18  the response costs associated with the SVE system. Dkt. 203 at 5. At the time of mediation, the

19  plaintiff was concerned that it would be difficult to attribute TCE remedied by the french drain to

20  Southgate. *Id.* at 5. The Court has previously held that "not all of the TCE at the Site is

21  attributable to releases from WSDOT facilities" but that "[e]ven with the aid of expert testimony,

22  the record does not demonstrate the extent to which contaminants captured by the french drain

23  are attributable to the WSDOT or to other responsible parties." Dkt. 181 at 34-35. The WSDOT

24  cites evidence in the administrative record demonstrating that Southgate was a source of TCE.

25  *See* 1101038-0106 ("Southgate Dry Cleaners has been identified as the PCE source, with a

26  portion of the PCE degrading to TCE."); 1101037-0029 ("Southgate Dry Cleaners may also be a

27  source of TCE observed in the area, because PCE is apparently being transformed into TCE." );

28  1105220-0030 (same). Evidence that Southgate was a source of TCE would have bolstered the

ORDER
Page 8

1  plaintiff's case against Southgate. Nevertheless, this evidence does not persuade the Court that
2  the plaintiff should have driven a harder bargain with Southgate.

3            **d. Conclusion**

4        The Court concludes that the plaintiff's settlement with Southgate is reasonable. It
5  represents satisfactory compensation for actual and anticipated response costs attributable to
6  Southgate, is consistent with the public interest, and is fairly based on the relative litigation
7  positions of the parties.

8          **2. Fairness**

9        Fairness has procedural and substantive components. *Montrose*, 50 F.3d at 746 ("(1) the
10 product of a procedurally fair process, and (2) substantively fair to the parties in light of a
11 reasonable reading of the facts"). Courts should evaluate the fairness of a consent decree from the
12 standpoint of non-settling defendants, but the effect on such defendants is not determinative.
13 *Cannons Engineering Corp.*, 720 F. Supp. at 1040.  The Court having previously determined that
14 the settlement process was procedurally fair, the Court now turns its attention to the issue of
15 substantive fairness. *See* Dkt. 200 at 8.

16       With regard to substantive fairness, "settlement terms must be based upon, and roughly
17 correlated with, some acceptable measure of comparative fault, apportioning liability among the
18 settling parties according to rational (if necessarily imprecise) estimates of how much harm each
19 PRP has done." *Cannons Engineering Corp.*, 899 F.2d at 87. There is no universal method for
20 measuring comparative fault, and the appropriate measure depends upon the factual
21 circumstances. *See id.* Courts should uphold the EPA's formula for measuring comparative fault
22 and allocating liability if " the agency supplies a plausible explanation for it, welding some
23 reasonable linkage between the factors it includes in its formula or scheme and the proportionate
24 shares of the settling PRPs." *Id.* The reviewing court must afford deference to an agency's
25 settlement, but the true measure of that deference depends upon the persuasiveness of the
26 agency's proposal and rationale. *Montrose*, 50 F.3d at 746. In other words, the agency's
27 allocation of fault should be upheld unless it is "arbitrary, capricious, and devoid of a rational
28 basis." *Cannons Engineering Corp.*, 899 F.2d at 87.

ORDER
Page 9

1    One method of assessing comparative fault is to determine the proportional relationship

2    between (1) the amount of money to be paid by the settling defendant and (2) the government's

3    estimate of total potential damages. *Montrose*, 50 F.3d at 747. Courts may consider the ability of

4    the government to collect from non-settling defendants and may include reasonable and justified

5    discounts, such as for litigation risks and time savings. *Id.*

6    The Court ordered supplemental briefing on this issue because the United States "offer[ed]

7    no method of assessing the comparative fault of Southgate and the WSDOT, contending only that

8    the WSDOT is more culpable than Southgate and that Southgate's assets are limited." Dkt. 200 at

9    9. The Court encouraged the United States to consider the identity of expenditures as an

10   alternative theory for allocating response costs. *Id.* at 10. The Court held that

11   "[a]t a minimum, the plaintiff should identify the response costs covered by the amount that

12   Southgate has agreed to pay." *Id.*

13   The plaintiff's supplemental briefing addresses this issue and provides a theory for

14   allocating response costs between Southgate and the WSDOT based upon what the parties knew

15   at the time the settlement was reached. Specifically, the United States determined that Southgate

16   was responsible for roughly $500,000 spend on the SVE system and that the WSDOT was

17   responsible for roughly $600,000 spent on the air strippers. Dkt. 203 at 7-8. Based upon these

18   figures, the United States and Southgate crafted a settlement whereby Southgate would be

19   responsible for approximately ten percent of the joint and several response costs. *Id.* This is an

20   admittedly imprecise formula and it does not take into account the Court's later ruling that the

21   response costs associated with the air strippers are not recoverable from the WSDOT, and it does

22   not reflect the actual cost of the SVE system ($674,433.99). Dkt. 203 at 7; Dkt. 211 at 4. These

23   later developments were not simply not known at the time of the settlement. The WSDOT

24   apparently contends that the plaintiff should have known that it would not prevail in its attempt to

25   recover response costs for the air strippers and should have crafted a different settlement with

26   Southgate on the basis of that knowledge.

27   The Court should not hold the plaintiff to such a standard. Notably, the plaintiff's

28   arguments regarding the air strippers survived summary judgment. Dkt. 160 at 11 (Order holding

1    that "the administrative record evidences increased groundwater contamination over time and a

2    threat of upgradient chemicals migrating to endanger uncontaminated wells sufficient to rebut the

3    charge that the EPA was arbitrary and capricious."). Moreover, there is insufficient evidence to

4    conclude that the EPA's omission of $156,302.07 when allocating costs of the SVE system was

5    anything other than an inadvertent mistake. *See* Dkt. 195 at 14.

6    　　　　The WSDOT offers other ways in which to compare the defendants' fault. Dkt. 211 at 7-

7    8. While the United States certainly could have reached a different settlement with Southgate, the

8    WSDOT does not persuade the Court that the settlement ultimately reached is substantively

9    unfair. The terms of the proposed consent decree roughly correlate with an acceptable measure of

10   comparative fault such that the Court should decline to rule that the proposed consent decree is

11   arbitrary, capricious, and devoid of a rational basis.

12   　　　　The Court also invited supplemental briefing to explain the effect of any recovery on "the

13   Non-Ace/Aetna Policies." Dkt. 200 at 10. In response, the plaintiff has modified the Trust

14   Agreement to clarify that recovery from Non-Ace/Aetna insurers will inure to the benefit of the

15   Palermo Wellfield Special Account in the EPA Hazardous Substance Superfund. Dkt. 203 at 9;

16   Dkt. 203-3 at 2. The United States and the WSDOT are in agreement that any recovery on these

17   policies will reduce the amount of future response costs for which the WSDOT is otherwise liable.

18   Dkt. 193 at 10; Dkt. 190 at 9. The consent decree, to which the WSDOT is not a party, need not

19   address its effect on the WSDOT's liability.

20   　　　　Finally, the plaintiff contends that the proposed consent decree is substantively fair in its

21   consideration of Southgate's ability to pay. Dkt. 203 at 10. During settlement negotiations,

22   Southgate's assets were described as follows: (1) $60,000 in annual net rent income and (2) real

23   property assessed at $1.9 million subject to a mortgage of approximately $500,000. Dkt. 203 at

24   10-11. The terms of the proposed settlement decree reasonably correlate with Southgate's ability

25   to pay. Based upon the parties' supplemental briefing, the Court should hold that the proposed

26   consent decree is substantively fair.

27   　　**3. Consistency with CERCLA**

28   　　　　The two major policy concerns underlying CERCLA are the desire to equip the federal

1   government with the tools necessary to promptly and effectively respond to problems resulting

2   from hazardous waste disposal and to require parties responsible for those problems to bear the

3   costs of remedying the harm. *Cannons Engineering Corp.*, 899 F.2d at 90-91. CERCLA's

4   overarching principles are accountability, the desirability of an unsullied environment, and

5   promptness of response activities. *Id.* at 91.

6          The Court has previously declined to rule that the proposed consent decree is consistent

7   with CERCLA because it was unclear how Southgate's payments under the consent decree

8   corresponded the overall harm at the Site and whether any response costs covered by the

9   proposed consent decree resulted from actions deemed not recoverable from the WSDOT. Based

10  upon the plaintiff's supplemental briefing regarding the theory for allocating response costs

11  between Southgate and the WSDOT, addressed in more detail above, the Court should hold that

12  the proposed consent decree appropriately holds Southgate accountable by requiring it to bear a

13  reasonable proportion of the joint and several response costs.

14         **4. Other Concerns**

15         The Court also invited the parties to address two additional issues in their supplemental

16  briefing: (1) the qualifications and experience of the named trustee, Daniel J. Silver, and (2) the

17  Trust Agreement's limitation of the trustee's liability to gross negligence or willful misconduct.

18  Dkt. 200 at 11-12.

19         The plaintiff has sufficiently addressed these concerns. First, the plaintiff has provided the

20  Court with a copy of Mr. Silver's resume, which demonstrates that Mr. Silver has experience

21  serving as a trustee for environmental cleanup trusts, as Deputy Director of the Washington State

22  Department of Ecology, and in various other capacities sufficient to allay concerns as to Mr.

23  Silver's background and qualifications. Second, the plaintiff has modified the Trust Agreement to

24  clarify that the trustee owes fiduciary duties to the beneficiary.

25         **5. Conclusion**

26         The Court concludes that entry of the proposed consent decree is proper. The settlement

27  reached by the United States and Southgate is reasonable, requiring a party allegedly responsible

28  for harm to the environment to bear the costs of remedying that harm. The settlement was both

ORDER
Page 12

1  procedurally and substantively fair. Based upon the information known to the parties at the time

2  of settlement and the risks of litigating the legal issues, the parties reached a settlement that

3  roughly correlates with an acceptable measure of Southgate's comparable fault and appropriately

4  considers Southgate's ability to pay.  Finally, the Court concludes that the proposed consent

5  decree is consistent with CERCLA's underlying policies.

6  **B. AWARD OF RESPONSE COSTS**

7        Following a bench trial, the Court issued an Opinion in which it held that the removal

8  action, installation of the air strippers, was inconsistent with the National Contingency Plan. Dkt.

9  181 at 22. The Court also held that the selection of the french drain as part of the remedial action

10  was not arbitrary and capricious and that the harm addressed by the french drain was not divisible.

11  *Id.* at 29, 35. Having concluded that the EPA was arbitrary and capricious only as to the removal

12  action, the Court was tasked with determining what portion of response costs were recoverable.

13  Because the WSDOT had not identified which response costs were associated with the removal

14  and should be disallowed, the Court ordered more briefing on the issue of damages. *Id.* at 27, 36-

15  37. The Court ordered the WSDOT to file a brief addressing which portion of the response costs

16  the WSDOT may avoid in light of the Court's Opinion. *Id.* at 37.

17        Based upon the parties' briefing, the Court held that the plaintiff is not entitled to recovery

18  of response costs associated with the design and installation of the air strippers. Dkt. 200 at 14.

19  The Court provided the parties an opportunity to stipulate to certain cost discrepancies and

20  declined to award damages until the Court determined whether entry of the consent decree was

21  proper. *Id.* at 15-16.

22        The parties now agree that the EPA incurred $5,646,676 in response costs associated with

23  installation and design of the air strippers. Dkt. 210. Accordingly, the United States now asks that

24  the Court enter judgment against the WSDOT for $5,541,620.16 plus interest, which represents

25  costs for unreimbursed costs incurred through December 31, 2005, excluding costs associated

26  with the design and installation of the air strippers and costs associated with the SVE system. Dkt.

27  195 at 15; Dkt. 210 at 1. Having determined that entry of the proposed consent decree is proper

28  and the parties having stipulated to the amount of unrecoverable costs associated with the air

ORDER
Page 13

strippers, the Clerk should enter judgment in favor of the United States for $5,541,620.16 plus interest.

## V. ORDER

Therefore, it is hereby

**ORDERED** that the Court approves the proposed consent decree. It is further

**ORDERED** that the United States is awarded $5,541,620.16 plus prejudgment interest. It is further

**ORDERED** that the Clerk shall enter judgment on July 5, 2007, in favor of the United States for $5,541,620.16 plus prejudgment interest accruing from the later of (1) the date payment of a specified amount was demanded in writing, or (2) the date of the expenditures concerned, pursuant to 42 U.S.C. §9607(a)(4). The parties should submit their prejudgement interest figures to each other and to the Court before July 5, 2007.

The Clerk of the Court is instructed to send uncertified copies of this Order to all counsel of record and to any party appearing pro se at said party's last known address.

DATED this 20th day of June, 2007.

Robert J. Bryan
United States District Judge